## J. E. BEARDEN v. THE STATE.

### No. 3031. Decided November 23, 1904.

**1.—Manslaughter—Continuance—Cumulative Testimony.**

Where the record showed that it was the third or fourth application for continuance and that testimony of the absent witness was purely cumulative, even conceding its probable truth, there was no error in refusing the application.

**2.—Conduct of State's Counsel—Allusion to Previous Conviction.**

Where the testimony with reference to defendant's former conviction drawn out by the State on cross-examination was withdrawn from the consideration of the jury by a special charge of the court, it was not cause for reversal, although this character of examination is criticised.

**3.—Evidence—Size and Condition of Deceased.**

Where the evidence showed that appellant had made a direct assault upon deceased just immediately before the shooting, and appellant complained of the violent character of deceased, it was not error to permit the State to prove that deceased was a delicate and sickly man and the relative size of defendant and deceased.

**4.—Misconduct of Jurors—Compromise Verdict.**

Although it is highly reprehensible conduct for a juror to make affidavit that he had reached a verdict by way of compromise, instead of trying the case according to the law and the evidence, it cannot be used to set aside and destroy the solemn verdict of the jury.

#### ON REHEARING.

**5.—Continuance—Witness Friendly to Deceased.**

Where the record disclosed the fact that the testimony of the absent witness could have been procured from State's witnesses who were present upon defendant's trial under process of the court, there was no error in refusing a continuance, although these witnesses were personally friendly to deceased.

Appeal from the District Court of Bell. Tried below before Hon. Jno. M. Furman.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The following taken from appellant's brief contains the substance of the facts proved on the trial:

The evidence shows that appellant and deceased had rented adjoining farms and the fence that separated the two farms was down at a place near defendant's house and some of appellant's cattle had gotten into deceased's pasture. Deceased made complaint of this to the wife of appellant, and on Thursday before the killing came to fix the fence. Appellant offered to assist him, but deceased declined his assistance,

saying, "I don't need your help," and as appellant started to leave, deceased threw his gun down on defendant, and told him if he moved out of his tracks he would kill him, and while he held the gun on him, he cursed and abused him, and among other things called him a damn son of a bitch. Appellant threatened to prosecute him for this mistreatment and started off to make complaint against deceased, and as he passed out the gate where deceased was at work, deceased told him if he would not prosecute him he would take the son of a bitch part back, but defendant declined this proposition, and went on, and made the complaint. On the next day appellant went over to his father-in-law's and tried to sell out, as he says, for the purpose of leaving the country to keep from having trouble with deceased, as he knew him to be a violent and dangerous man. Appellant had borrowed some sideboards from T. T. Moore, a merchant in Rogers, and on Saturday (the day of the killing) he went to Rogers to return the sideboards and for the purpose of doing some trading and stopped on the way at his father-in-law's, Sam Frazier, and got Mr. Frazier's pistol. He says he was afraid that deceased would attack him again, and that he got the pistol to defend himself. After defendant reached Rogers he went to Allison's saloon, and there met Will Joiner. He and Joiner went out in the back of the saloon and there had a talk about deceased attacking him at his home on the Thursday before, and Joiner told him that deceased said if he prosecuted him (deceased) that he would never live to testify. When appellant left the saloon, he went out the front door and there he unexpectedly came upon and confronted the deceased, who was standing in front of the saloon on the sidewalk, talking to Jesse Hearston, Frank and Quince Raney. Appellant says he spoke to all of these gentlemen and said, "Howdy, gentlemen," and then turned to Hearston and said: "Is this Mr. Hearston?" and he replied, "Yes," and they shook hands and talked awhile with him. Appellant testified as to what took place from this time on until after the shooting ceased, as follows: "I then turned to deceased and asked him what reason he had for treating me the way he had at my house and he told me to go away and let him alone. I asked him again and he made me the same reply. He then turned about half way around and I asked him what cause he had to call me a God damn son of a bitch, and he said I was one, and started to put his hand in his pocket to get his knife and he said he would cut my damn throat, and I knocked him off the gallery and he caught on his feet and opened his knife and came up the steps with his knife open in his right hand and as he got to the top of the steps Hearston caught him and deceased got loose from Hearston and I started to pull my gun; it was a double action pistol, 38-caliber, and as I got it out of my pocket, I pulled the trigger too hard and it went off down in the floor of the sidewalk. By this time deceased had gotten away from Hearston and had started to me with his knife open in his hand and I threw my gun on him and fired and at the instant I fired he turned or whirled very quickly, and I fired again. He ran in the saloon and I followed

and fired two more shots. The first shot was accidental, and when I shot the second time he was coming right at me with his knife in his hand and from his looks and actions at the time I thought he was going to kill me and I shot him to prevent him from doing so, and that was the reason and the only reason that I shot him. The third shot hit the door post and the fourth and fifth shots hit the wall of the house inside. I was very much excited as I continued to shoot and I do not remember all that took place during, or just after the shooting. I do not remember snapping the pistol at deceased after I went in the house. I did not want any trouble with deceased and was not looking for him when I run upon him as I came out of the saloon, and when I spoke to him my only purpose was to peaceably settle the trouble with him and I addressed him in a peaceable quiet way."

J. Q. Rainey testified to what transpired between appellant and deceased just before the killing as follows: "Sometime about 2 o'clock on the day of the homicide, brother Frank, Tom Terry and I came out from the north side of the street to the south side. We were going east to Moore's store and in front of Allison's saloon we came up to where Jesse Hearston and deceased were standing; all of us stood there and talked about weather and crops for some time, don't know how long, it may have been a half hour or longer. Hearston, deceased and I were standing on the edge of the gallery facing the saloon, Hearston being nearest, and just west of the steps. The defendant came up to us; I think he came along the sidewalk from the east, that is, from toward Moore's store, and said, 'Hello, Chinaman,' and deceased said, 'Howdy.'' Defendant then said to Hearston, "This is Mr. Hearston, I believe.' Hearston said, 'Yes,' and they talked a short while and defendant said to deceased, 'What in the hell, God damn you, did you mean the other day in saying what you did to me?' Deceased said, 'Go away and let me alone,' and at this point, Tom Terry and I went off to Moore's store and I saw nor heard no more of the difficulty. While in the store I heard some shots and I returned and assisted deceased to doctor's office. When defendant said, 'Hello, Chinaman' I did not take it that he addressed the remark to anyone present in particular.

"All I heard deceased or defendant say up to the time I left was in a peaceable, quiet tone of voice. I do not know whether defendant has an impediment in his speech or not. It did not make me mad when defendant said, 'Howdy, Chinaman,' and if any one in the crowd got mad I could not tell it, and his manner did not indicate that he addressed the remark to any one in particular. I stated on a former trial of this case that after defendant and Hearston had talked awhile, defendant turned to deceased, and said, 'Why in the hell did you treat me as you did the other day and throw a shot gun down on me, God damn you,' and I walked off. Brother Frank was there all the time I was, and heard or could have heard all that I did. I have been with the deceased's brother a good deal while we were together attending the trials of this

case. I have not spoken to defendant since the first trial of this case in March, 1902."

Tom Terry testified as follows: "I was present with Mr. J. Q. Raney and Frank Raney and Hearston and deceased and defendant just before the shooting and I heard defendant say to deceased: 'What reason did you have for drawing a gun on me and talking to me like you did the other day?' and deceased said, 'Well, I reckon a man has a right to carry a shotgun where he wanted to,' and defendant asked him again and deceased said; 'Go away and let me alone, I do not want any trouble with you.' J. Q. Raney and I then started to walk off and as we went away I heard some one say, 'You damn son of a bitch, I will cut your damn throat.' I heard this just as we got to Tede Moore's store door. Deceased and defendant were talking together when we left them, but this is all I remember they said. When defendant was talking to deceased, it was in a mild tone of voice, not at all like he was mad." Question—While you were there was this expression used by defendant?: "Why in the hell, God damn you, did you treat me as you did the other day?" Ans.—"No, sir, it was not."

"I was about five or six feet away from deceased and defendant when they had the talk that I have related. The language I heard some one use, saying, 'You damn son of a bitch, I'll cut your throat,' was in a loud, angry tone of voice. I knew neither of the parties at the time, in fact, I was an entire stranger in the town of Rogers then. Joe Fincher was there at the time I was. I did not know him then, but I know him now. I have picked some cotton for defendant since the trouble but we said nothing about what I would testify in this case. I testified in this case at the first trial.

"When I testified first in this case I had never spoken to the defendant in my life and I testified about the same then as I do now."

*J. B. McMahon, Nelson & Little* and *A. W. Gibson,* for appellant.— The first question complained of by appellant is the action of the court in overruling his motion for a new trial, based on the court's refusal to grant his motion for continuance, because of the absence of the witness, Jim Brumblow. The motion for continuance shows that said witness would have testified that he was present during the entire difficulty between defendant and deceased, and when defendant walked up to the crowd where deceased was standing, talking to Frank and Quince Raney, he said, "Howdy, gentlemen"; and after talking awhile with the others, he then turned to deceased and said, "Mr. Newcomb, what right did you have for abusing me like you did the other day?" and Newcomb replied to him, "Go away and let me alone." Defendant made the same inquiry of deceased and received the same reply. Defendant then said to deceased, "Mr. Newcomb, what cause had you to call me a son of a bitch?" and Newcomb replied, "Because you are a damn son of a bitch," and at the same time he made this statement he ran his hand in his pocket as if to draw a knife or some other weapon,

and the defendant knocked him off the sidewalk, and as soon as the deceased struck the ground, he saw his knife open in his hand, and saw him advance directly up the steps and onto the sidewalk, and just as he reached the top of the steps Mr. Hearston caught him and about this time defendant fired his pistol down into the sidewalk. At this time deceased was struggling to get loose from Hearston, which he succeeded to do, and just as Hearston got out from between them defendant fired the second shot, and at this time deceased was advancing upon defendant with his knife open in his hand. At the second shot the deceased turned and went into the saloon, and the witness heard three more shots."

The statutory rule is: "that should an application for continuance be overruled and the defendant convicted, if it appear upon the trial that the evidence of the witness or witnesses named in the application was of a material character, and the facts set forth in said application were probably true, a new trial should be granted. White's Code Criminal Procedure, article 597. The Court has frequently had this article of the statute before it for construction, and the decisions are uniform in holding that although the court may have held correctly in overruling the motion for continuance in the first instance, yet if on the motion for new trial it appears that the testimony of the absent witness is material and probably true: the new trial should be granted. Jackson v. State, 23 Texas Crim. App., 183; Covey v. State, 23 Texas Crim. App., 388; Mayfield v. State, 23 Texas Crim. App., 645; Lawson v. State, 21 Texas Crim. App., 172; Schultz v. State, 20 Texas Crim. App., 315; Stanley v. State, 16 Texas Crim. App., 392; Clark v. State, 38 Texas Crim. Rep., 30; Richards v. State, 34 Texas Crim. Rep., 277; Ferguson v. State, 31 Texas Crim. Rep., 93; Hyden v. State, 31 Texas Crim. Rep. 401; Ainsworth v. State, 29 Texas Crim. App., 599; Eads v. State, 26 Texas Crim. App., 69; Brooks v. State, 26 Texas Crim. App., 87; Price v. State, 22 Texas Crim. App., 110; Frazier v. State, 22 Texas Crim. App., 120; Sims v. State, 21 Texas Crim. App., 649; Parker v. State, 18 Texas Crim. App., 72; Garcia v. State, 15 Texas Crim. App., 120; Lawson v. State, 13 Texas Crim. App., 264; Ratliff v. State, 12 Texas Crim. App., 330; Casinova v. State, 12 Texas Crim. App., 554.

That it is clearly shown there was misconduct on the part of the jury, there can be no question, and it is equally clear that appellant's rights were bartered away by them. This being so, can the affidavits of the jurors be received to establish such misconduct? It seems to be the settled rule in this State, that in civil cases such affidavits can not be received for that purpose, and there have been a few criminal cases which announce the same doctrine. These cases follow the common law. It is expressly provided by our code that a defendant is entitled to a new trial, "where from the misconduct of the jury the court is of the opinion that the defendant has not received a fair and impartial trial, and it shall be competent to prove such misconduct by the voluntary

affidavit of a juror; and a verdict may, in like manner, be sustained by such affidavit." White's Code Criminal Procedure, article 817, subdivision 8. This plain provision of our statute, it would seem, makes it clear that the misconduct of a jury may be shown by the voluntary affidavit of a juror. This court has also held that it was proper to establish the misconduct of the jury in such manner. Kelly v. The State, 28 Texas Crim. App., 120; McCane v. The State, 33 Texas Crim. Rep., 476. The last cited case is directly in point. Those cases which are in conflict with this statute and the cases cited, we submit, should be overruled.

On the propisition of counsel's reference to former conviction: Article 823, White's Code Criminal Procedure; Hatch v. State, 8 Texas Crim. App., 416; Pickett v. State, 51 S. W. Rep., 374; Gann v. State, 59 Id., 896.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of manslaughter, his punishment being assessed at confinement in the penitentiary for a term of two years. The former appeal of this case is reported in 79 S. W. Rep., 37; 9 Texas Ct. Rep., 813.

The first bill of exceptions complains that the court erred in overruling application for continuance for want of the testimony of Jim Brumblow. The record shows that this is the third or fourth continuance granted appellant, even conceding the probable truth of the testimony of the absent witness, it is purely cumulative of the testimony of other witnesses, as shown by the record, and the court did not err in overruling the same.

Bill number 2 shows that while defendant was on the stand as a witness, he was asked by his counsel the following questions. "Is it not a fact that Frank Rainey (brother of Quince Rainey) is here now in attendance on this trial as a witness, and has he not been in attendance at every trial of this case?" A. "Yes, he is here now and has been at every trial of the case." Q. "Is it not a fact that he was summoned by the State, and the State has failed to put him on the stand to testify?" A. "Yes, he was summoned by the State, and although now present in court, and has been present at every trial of this case, and the State has failed to put him on the stand to testify." Q. "Is it not a fact that Claud Elmore is here now in court, summoned as a witness for the State, and the State has failed to put him on the stand?" To which question the witness answered, "Yes, he is here, summoned as a witness for the State, and has been here at the previous trials of this case, the State put him on the stand at the last trial, but failed to put him on at this trial." "Is it not a fact that Joe Fincher is here in court now and the State has failed to put him on the stand as a witness at this trial?" A. "Yes, he is present here at court and the State has failed to put him on the stand." Q. "Is it not a fact that Jesse Hearston is here now and the State has failed to put him on the stand,

and is it not a fact that he has been here at every trial of this case and the State has failed to put him on the stand, except at the first trial of this case when there was a hung jury?" A. "Yes, he is here now in court and the State has failed to put him on the stand and has never used him as a witness except at the first trial when the jury *hung.*" Q. "Is it not a fact that you have been out on bond all the time?" A. "Yes." Defendant was then turned over to counsel for State to cross-examine, and Mr. Mathis propounded the following question: "You told Mr. McMahon that you had been out on bond all the time,—do you mean to say that you have been out on bond all the time?" To which he answered, "Yes, except when I was convicted." Q. "Did you put Mr. Hearston on the stand at the time you were convicted?" To which appellant objected on the ground that same was an attempt to get before the jury immaterial and irrelevant matter, and was an allusion to the former conviction of defendant in this case, and was in violation of the plain provisions of the statute which forbids counsel from making any allusion to the former trial and conviction of defendant. The court sustained the objection, and counsel also objected to the conduct of counsel for State asking said question, because it was his purpose to bring before the jury the fact that defendant had been convicted by a jury of twelve men upon the same charge that he was then being tried for, and did get before the jury said facts, in that by asking such question, defendant's counsel was forced to object to the same, and the court refused to compel defendant to answer the question, which caused the jury to believe and know that he had been convicted on the former trial of the case. State's counsel then addressed the court and stated, in the presence and hearing of the jury, that defendant had already testified that he had been convicted, in answer to the question that he asked him, if it were true that he had been out on bond all the time. Defendant said he had been out on bond all the time, except when he was convicted. Appellant's counsel then stated to the court that if defendant had made that statement he did not hear it; and therefore did not object to the same at the time, and now here desired to make the following objections to the testimony, and ask that the same be stricken out, and that the jury disregard the same. Defendant objected to the testimony because drawn out by the State on cross-examination, and was irrelevant, immaterial, and calculated to injure defendant before the jury. The court stated he would charge the jury to disregard said evidence, and did so charge the jury in his written charge. We have heretofore animadverted upon the efforts of the prosecution to use the previous conviction as a predicate for a verdict upon a trial then being had, which is expressly inhibited by the statute. However, we do not think that the record before us shows such conduct on the part of State's counsel as justifies the reversal of this case. We desire again to renew our admonitions heretofore expressed in the opinions of this court against this character of examination of witnesses and

conduct of counsel. It seems that, without objection, defendant stated he had been convicted.

Bill of exceptions number 3 complains of the failure of the court to give a special charge. So far as applicable it was given in the main charge of the court.

The fourth bill complains that the State was permitted to prove that deceased was a delicate and sickly man, and to prove the relative size of defendant and deceased. We see no error in this. While, as appellant insists in his brief and argument, a small man can shoot as well as a robust one, yet there seems to have been a direct contact and assault made by appellant upon deceased just immediately before the shooting. Furthermore, appellant is complaining of the violent character of deceased, both by his general reputation and his personal knowledge of him. Under the peculiar facts of this case, we think this testimony was germane and proper.

The second ground of the motion for new trial complains of the misconduct of the jury in arriving at their verdict. F. A. Cottle, one of the jurors, makes an ex parte affidavit, attached to the motion and made a part thereof, in substance, as follows: that when the first ballot was taken five jurors voted for acquittal and seven jurors voted for conviction. And after awhile the second vote was taken, and six voted for acquittal, and six for conviction. This second vote was taken just before the jury retired for the night, and on the next morning another vote was taken, and the jury then stood seven for conviction and five for acquittal. The jury remained this way until the last vote was taken. "I then proposed a compromise verdict; that is, I agreed that if all the jury would vote for manslaughter and two years punishment, and also agree to sign a petition for pardon, I would agree to vote for manslaughter and two years, and all the jury consented to this, and we took a vote which resulted in defendant's conviction." J. M. Moore, another one of the jurors, made affidavit substantially to the same facts. Under the laws of this State, when the jury is impaneled, they are sworn to try the case according to the law and the evidence. Now, in this case we have two jurors, who were evidently sworn, making affidavit that they did not try the case according to the law and the evidence adduced. The bare statement of this, shows the outrageous conduct of the jury. Here we have one oath against another oath; one, in which he swears he will try the case according to the law and the evidence, and another in which he publicly confesses by affidavit that he did not do so. If this were a question of fact upon which we could pass, we would be at a loss to know which oath to accept. But, under the decisions of this court, and all courts, such reprehensible conduct is not permitted to be used to set aside and destroy the solemn verdict of the jury. In Montgomery v. State, 13 Texas Crim. App., 74, two of the jurors agreed to a verdict of conviction upon an agreement that the jury would sign a pardon to the governor for defendant. We there held that defendant will not be permitted to show any such fact, and the court would not have erred, if he had

stricken the two affidavits from the record of the trial court. To permit a juror to impeach his verdict in any such manner would be to sanction a very reprehensible practice, and would be fraught with great danger to the due and orderly administration of justice.

Appellant urges various and sundry exceptions to the charge of the court, but we think the charge is an admirable presentation of the law applicable to the facts of this case. The errors pointed out in the charge of the court on the previous trial have been eliminated on this trial. The verdict of the jury is amply supported by the evidence, and the judgment is affirmed.

*Affirmed.*

BROOKS, Judge.—This case comes before us on rehearing. Appellant renews his insistence that the court erred in not granting him a continuance, in order to secure the testimony of Jim Brumblow. We held in the original opinion that the application was not good, on the ground that the testimony was cumulative of other testimony. Appellant combats this. Waiving whether we are correct or not in that position, we have reinvestigated the record. In his motion for new trial appellant makes the following statement, to wit: "The record further shows that on a former trial of this case, one P. D. Fowler, and Joe Fincher were present and testified substantially the same as the defendant expects to show by the witness, Jim Brumblow, and the record further shows that Frank Rainey, brother of Quince Rainey, a strong personal friend of the deceased, was present during the conversation between deceased and defendant, testified to by Quince Rainey, and although summoned by the State, and although present at every trial of this case, the State has failed and refused to put him upon the stand to testify in this case. The record further shows that Joe Fincher was subpœnaed by the State, as well as Jesse Hearston, but that the State has refused to place them on the stand, except on the first trial or rather mistrial, when a hung jury was had, the State placed Jesse Hearston on the stand, but since that time the State has failed and refused to place any of the witnesses who were immediately present during the conversation that took place between defendant and deceased just prior to the killing." The motion also states that these parties were strong personal friends of deceased. The fact that this was true, and they would testify to the same facts as the absent witness, if present, clearly excludes any right appellant would have to a continuance, because it shows conclusively that testimony was present which appellant refused to put on the stand, simply because the witnesses were personal friends of deceased. This is not a proper ground for refusing to use the witnesses at hand. Nor would it authorize this court to reverse the case in order to get a witness more friendly to appellant.

We do not deem it necessary to review the other grounds of the motion. The motion for rehearing is overruled.

*Motion overruled.*