No. 2931.

CLIFTON DOUGLASS *v.* THE STATE.

1. ASSAULT TO MURDER—INDICTMENT.—It is not essential that an indictment for assault with intent to murder shall allege the means used nor the manner in which it was used to effectuate the murderous intention.

2. SAME—CHARGE OF THE COURT.—The indictment alleged that the assault was committed with a gun, and the proof showed that it was committed with a pistol. The court instructed the jury to convict if it appeared from the evidence that it was committed with a gun or a pistol. *Held,* correct, under the general rule that there is no material variance when the instrument alleged and that proved are of the same nature and character, and capable of inflicting the same kind of wound.

APPEAL from the District Court of Robertson. Tried below before the Hon. John N. Henderson.

This conviction was for an assault with intent to murder one Henry Harrison, in Robertson county, Texas, on the tenth day of January, 1885. The penalty assessed was a term of three years in the penitentiary.

Henry Harrison was the first witness for the State. He testified that he and the defendant lived on Horatio Hearne's place, in Robertson county, Texas, their respective homes being about one hundred yards apart. On a certain Tuesday night, late in January or early in February, 1885, some person knocked at the door of the witness's said house. Witness opened it and

the defendant entered with a pistol in his hand, and proceeded to abuse and denounce the witness in a violent manner, calling him, among other things, "a d—d black son of a bitch." Witness asked defendant what he had done to offend him, and defendant, again cursing and abusing witness, replied that witness or members of witness's family had eavesdropped his house, after which the witness had talked about him. Witness denied the charge thus preferred against him by the defendant, and defendant replied that the witness was a d—d lying son of a bitch. He remained in witness's house fully thirty minutes, cursing and abusing the witness, and then left, remarking that if the witness reported him he would "blow hell out of " witness. On the next morning the witness went to the house of the defendant to ascertain, if possible, the cause of the conduct of the defendant on the previous night. He found the defendant sitting on a stool, still undressed, and in his drawers and underclothing. He had his pistol in his hand and across his lap, and proceeded at once to curse and abuse the witness in the manner he did on the night before. Witness then went home, but in about thirty minutes returned to the defendant's house and found the defendant lying on the floor of his room, covered to his waist with a cloth. His pistol was lying on the floor near his right hand. Witness asked him what was the matter with him. He reiterated that the witness had eavesdropped his house and then talked about him, and proceeded to curse and abuse the witness as before.

Witness spent a part of the following Sunday away from his home, and on his return his wife told him that during his absence the defendant came to the house and told her that if the witness did not quit talking about him, he would make witness's house too hot to hold him. Within a very short time after witness's wife told him of defendant's visit on that morning, the defendant and one Henry Leonard came by witness's house. Leonard came into the house, but defendant passed the house on the north side. Witness was then standing at the west end of the south gallery, against the gallery post. Witness saw the defendant as he passed the northwest corner of of the house, and hallooed to him: "I hear that you are going to make my house too hot for me." Thereupon the defendant drew his pistol, advanced upon the witness, replied: "I will make it too hot now," and fired at the witness. The ball passed through the left side of the witness's overcoat, and

lodged in the water shelf on the south side of the gallery. Witness rushed into his house, seized his double barrel shot gun, and went to the window on the the north side of his house. He looked out through that window, and the defendant fired a second shot at him. Witness then thrust his gun through the said window and fired at the defendant, the gun being charged with small shot. Defendant then went on towards his house. When he reached a vacant house in a westerly direction from the witness's house, he flourished his pistol and called to witness; "Come out, you d—d cowardly son of a bitch!" Defendant was between fifteen and twenty feet distant from witness when he fired the first shot.

On his cross examination the witness denied that he had ever threatened to kill the defendant. He denied that he ever said, in the presence of the defendant's wife, that he would kill the defendant if he did not let his, witness's, sister-in-law alone. Witness was not on his gallery, just before the shooting, looking for the defendant, nor did he see the defendant until the latter passed the corner of the house.

Cassie Harrison, the wife of the prosecuting witness, testified, for the State, that, on Sunday morning, about the date alleged in the indictment, while Henry, witness's husband, was away from home, the defendant came to the house and told witness that, if Henry and his people did not quit talking about him, he would kill the said Henry. Henry returned a short while after defendant left, and witness told him what had transpired, and what the defendant said. A short while afterwards, Henry then being on the gallery, leaning against a post, and the witness in her room, the witness heard the report of a pistol, but did not see the person by whom it was fired. Henry rushed into witness's room immediately after the report, seized his shot gun and went to the north window. About the time he reached the window, the witness heard another report of a pistol fired from the outside, but did not see the person who fired it. Henry then thrust his gun through the window and discharged it, but at whom or what witness did not see. Soon afterwards witness looked out and saw the defendant at a vacant house, between his own and Henry's house, flourishing his pistol. He called to Henry: "Come out, you coward, you!" He then called to his wife to bring him cartridges, who came to him and brought him something. Henry did not go outside of his house after the shooting commenced until after the defendant got home.

Henry was wearing his overcoat at the time of the shooting. He passed back and forth from the gallery to the room several times on that morning, and, as it was his habit to keep his hands in his overcoat pockets when he had it on, the witness presumed that he had them in those pockets when the first shot was fired.

Henry Leonard testified, for the State, that he was in company with the defendant on a Sunday morning about the time alleged in the indictment. When they reached Harrison's house, the witness left the defendant and went into that house, passing Harrison standing on the west end of his south gallery, about midway between the wall and the outer edge of the gallery. Defendant did not stop. Witness had about reached the fire in the sitting room when he heard Harrison call to some person: "I heard that you are going to make my house too hot for me." A pistol or gun shot was almost instantly fired from the outside. Harrison then rushed into the room, seized his gun and went to the window, through which he fired. Witness did not know what he shot at. Witness did not hear two shots fired from the outside, nor did he hear any cursing by anybody, nor did he see the defendant flourish his pistol. He afterwards saw where a ball struck the shingles just above the post on the south corner of the gallery. Cassie Harrison was in the room when witness heard the shot fired outside of the house.

Constable John Griffin testified, for the State, that, in January or February, 1885, a complaint was filed against the defendant, charging him with this offense, and a warrant upon the same for the arrest of the defendant was placed in witness's hands for execution. He went to Horatio Hearne's place to execute it, and while there went to Harrison's house, and Harrison called his attention to a place on the water shelf on the gallery, where a ball fired by some person had taken effect. It had split off a small piece from the edge of the shelf. Witness did not know who fired the ball that struck that shelf.

On his cross examination, this witness said that Harrison's house was about fourteen feet by sixteen feet in size, with a gallery on the south side room at the west end of the house. That gallery extended only to the side of the main building, and not the whole length of the said room. A person standing near the wall at the west end of the gallery, would be protected from the view of a person passing along at the north end of the

house. The fence was about ten feet north of the house, and a road ran with the fence on the outside. The State closed.

Annie Douglass, the wife of the defendant, testified, in his behalf, that, on the morning of the alleged offense, the defendant left home to go to Taylor Mark's house, between which two points the house of Henry Harrison intervened. Some time after he left, witness went to a point towards Harrison's house to gather fagots. While thus engaged, she heard Harrison's voice, but did not understand what he said. She then looked up, and saw Harrison thrust his gun through a crack in the wall of his house, and fire at defendant. She ran to her husband, and the two went home. Defendant did not wave his pistol on that occasion, nor did he curse at Harrison. Witness was at Harrison's house about a week before the difficulty, when Harrison accused his sister-in-law, now deceased, with criminal relations with defendant, and said that he would fill defendant full of buckshot if he did not let his sister-in-law alone. This concluding statement was denied by Henry Harrison, when placed on the stand in rebuttal.

*Simmons & Crawford,* for the appellant.

*W. L. Davidson,* Assistant Attorney General for the State.

WHITE, PRESIDING JUDGE. Appellant was indicted, tried and convicted in the lower court for assault with intent to murder. "An indictment for assault with intent to murder need not set forth the means used, nor the manner in which the means were used, to effectuate the murderous intention." (Price v. The State, 22 Texas Ct. App., 110, and many authorities cited.) In this case, however, the pleader has set forth and alleged in the indictment that the assault was committed "with *a gun,* the same being a deadly weapon." The testimony showed that the weapon used by the defendant was *a pistol,* and the court instructed the jury in substance, that if the assault as charged was committed with *a gun or pistol* they should convict. It is insisted that this instruction was erroneous, and that there is a fatal variance between the allegation and proof in this particular.

At common law, in an indictment for murder it was necessary to allege the means or weapon used (1 East's Pleas of the Crown,

341), and such allegation is requisite in an indictment for murder in this State. (Willson's Criminal Forms, No. 388, p. 173, and authorities cited.). But when the indictment is required to contain such an allegation Mr. Bishop says: "This is one of the cases in which proof of only the substance of the issue is required. Though at the trial the weapon appears not to have been the same as charged, yet to have produced the same sort of wound which it would have done, followed by the same sort of death, the averment is sustained." (2 Bish. Crim. Pro., 3 ed., sec. 514.)

Mr. Wharton says: "The common law rule in pleading the instrument of death is, that where the instrument laid and the instrument proved are of the same nature and character there is no variance; where they are of opposite nature and character, the contrary." (1 Whart. Crim. Law, 8 ed., sec. 519.)

"If the act of the prisoner and the means of death be proved in substance as alleged, the violence and death being of the same kind as alleged, a mere variance in the name or kind of instrument used will not be material (Bulst., 87) if the instrument was capable of producing the same kind of death. (9 Co., 67a; Gilb. Evid., 231; 1 Archbold's Crim. Prac. and Plead., 8 ed. Pomeroy's notes; note on p. 280.) Many other authorities might be cited but these are deemed sufficient, and they amply sustain the charge of the court and the sufficiency of the proof to sustain the allegation as to the means laid in the indictment by which the assault was committed. There is no substantial or material variance.

Other questions are presented by appellant, but they are not deemed of sufficient importance to require discussion. We have found no reversible error and the judgment is affirmed.

*Affirmed.*