# OCTOBER, 1919.

LEDGER GILBERT v. THE STATE.

No. 5109. Decided June 4, 1919.

Rehearing granted October 8, 1919.

**1.—Murder—Evidence—Declarations of Defendant.**

Upon trial of murder, there was no reversible error in admitting testimony that defendant, a short time before the homicide while looking at deceased, said "He is here isn't he," it appearing circumstantially that the reference was to the deceased and went to show at least that defendant took note of his presence.

**2.—Same—Evidence—Other Testimony—Order of Evidence.**

Upon trial of murder, there was no error in admitting testimony that the eyewitness of the State, a few minutes after the blow was struck, had said to another that he knew who struck the blow, as there was evidence of the same character admitted without objection; besides, the evidence was admissible in rebuttal to an attack made upon the testimony of said eyewitness, even if not in due order. Following Moore v. State, 7 Texas Crim. App., 14, and other cases.

3.—Same—Evidence—Foot Prints—Identity of Defendant.

Where, upon trial of murder, the evidence showed that the assailant, after inflicting the fatal blow, ran away, there was no reversible error in admitting testimony that shortly after the homicide a person ran across a certain field, one witness claiming that he had gone into the said field on the night of the homicide to answer a call of nature and that while there he heard a party running, nor was there error to admit testimony that there were tracks of a person running across said field, and also tracks corresponding to those which would have been made by said witness.

4.—Same—Rule Stated—Cumulative Evidence.

The rule does not exclude cumulative evidence of a relevant fact, where the identity of the slayer is the main issue, and the State may introduce evidence of all the surrounding facts and circumstances which may bear upon the subject of inquiry, and foot-prints found at or near the scene of the homicide are admissible in evidence. Following Haley v. State, 209 S. W. Rep., 675.

5.—Same—Evidence—Instrument Used—Description.

Where, upon trial of murder, the indictment described the instrument used as a stick with unnecessary particularity, yet where a stick exhibited to the jury was substantially identified as that used in inflicting the fatal blow, there was no reversible error.

6.—Same—Evidence—Reputation of Deceased.

Where, upon trial of murder, the defendant pleaded an alibi, there was no error in rejecting testimony to prove the reputation of the deceased for violence. Following Irwin v. State, 43 Texas 236.

7.—Same—Evidence—Imputing Crime to Another—Rule Stated.

The rule is that in a proper case testimony is admissible showing opportunity and motive of another person than the defendant, who is in such proximity to the homicide as to have committed the crime, where the identity of the defendant rests upon circumstantial evidence alone, yet testimony that, thirty days prior to the homicide, the deceased at another and distant place from the homicide cursed a certain person and told him he would cut his head off and chunk his body with it is inadmissible.

8.—Same—Declarations of Defendant—Self-serving Declaration.

Upon trial of murder, there was no error in excluding testimony that on a different occasion and sometime subsequent to that on which the defendant had uttered a threat against the deceased, the defendant said to a third party that deceased's cursing him hurt the deceased more than defendant, as this was hearsay and self-serving.

9.—Same—Evidence—Impeaching Witness—Rule Stated.

The defendant having introduced evidence to impeach the main State's witness by proof of statements contradictory of his testimony upon trial, the State was well within its rights in introducing in evidence the prior consistent statements made by said State's witness.

10.—Same—Evidence—Impeaching Witness—Collateral Issue.

Where the testimony offered was hearsay and an attempt to impeach the witness upon a collateral issue, it was properly refused.

**11.—Same—Evidence—Self-serving Declaration.**

Upon trial of murder, there was no error in excluding testimony of the conversation between the defendant and his brother, especially, where the substance of the conversation was admitted by other testimony.

**12.—Same—Conduct of Court—Trial Judge—Witness.**

Where it appeared from the record that the arrest of a certain witness for the defendant 'was not brought to the attention of the jury in a manner or at a time which was harmful to defendant, there was no reversible error.

**13.—Same—Evidence—Instrument Used—Description—Variance.**

Where, upon trial of murder, the indictment described the stick used in inflicting the fatal blow with unnecessary particularity, and defendant claimed a variance between the stick described in the indictment and the one introduced in evidence, yet where it was shown by the record that the stick exhibited to the jury and described by the witnesses was substantially the same as described in the indictment, there was no reversible error. Following Holliday v. State, 35 Texas Crim. Rep., 133, and other cases.

**14.—Same—Instrument Used—Rule Stated.**

While the rule is that a variance between the allegation and the proof is fatal although the description in the indictment of a thing necessary to be described was described with unnecessary particularity, yet the rule is equally mandatory that the proof is sufficient if it shows that the description of the weapon used as charged in the indictment is sustained by proof that the weapon used was substantially the same as the one described in the indictment, and the nature and result of its use was the same. Following Douglass v. State, 26 Texas Crim. App., 109, and other cases.

**15.—Same—Misconduct of Jury—Evidence Outside of Record.**

Where, upon trial of murder, and a conviction of said offense, the defendant set out in his motion for new trial misconduct of jury in that it received other testimony than that given on the trial, and the evidence on said motion showed that the jury in their retirement received testimony from one of their fellows which was based upon his own knowledge and not upon the testimony of the witnesses, upon a material fact, this court will not speculate as to the effect of such testimony upon the other jurors although some of them stated it had none, and the same is reversible error. Following McDougal v. State, 81 Texas Crim. Rep., 179, 194 S. W. Rep., 944. and other case.

Appeal from the District Court of Franklin  Tried below before the Hon. J. A. Ward.

Appeal from a conviction of murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Beavers & Wilkerson,* for appellant.—On question of description of instrument used: Robinson v. State, 60 Texas Crim. Rep., 592, 132 S. W. Rep., 944; Martinez v. State, 51 Texas Crim. Rep., 584, 103 S. W. Rep., 930; Allen v. State, 8 Texas Crim. App., 360.

On question of misconduct of jury: Williamson v. State, 62 Texas Crim. Rep., 132, 136 S. W. Rep., 1070; McKissick v. State, 9 id., 269; Branch Ann. Penal Code, sec. 566.

On question of declarations of defendant: Maclin v. State, 65 Texas Crim. Rep., 384, 144 S. W. Rep., 951; Duke v. State, 61 Texas Crim. Rep., 19, 133 S. W. Rep., 432.

On question of statement by third party: Peacock v. State, 52 Texas Crim. Rep., 432, 107 S. W. Rep., 346; Hughes v. State, 62 Texas Crim. Rep., 288, 136 S. W. Rep., 1068; Huey v. State, 81 Texas Crim. Rep., 554, 197 S. W. Rep., 202.

On question of corroborating fact of unimpeached witness: Taylor v. State, 79 Texas Crim. Rep., 274, 184 S. W. Rep., 224; Holmes v. State, 52 Texas Crim. Rep., 353, 106 S. W. Rep., 1160.

On question of imputing crime to another: Murphy v. State, 35 S. W. Rep., 174; Blocker v. State, 55 Texas Crim. Rep., 50, 114 S. W. Rep., 814.

On question of declarations of defendant about deceased. Gaines v. State, 42 S. W. Rep., 85.

*E. B. Hendricks*, Assistant Attorney General, for the State.

MORROW, JUDGE.—The appeal is from a conviction for murder with a penalty of five years confinement in the penitentiary.

The deceased, Arthus Grenlee, was struck on the head with a stick of timber one blow which resulted in his death. The assault occurred immediately after services at the church had ended and while deceased was starting away on foot. There was evidence of a difficulty between appellant and deceased about two weeks prior to the homicide in which the deceased used insulting language toward the appellant. Subsequently according to State's witness appellant expressed his intention to kill the deceased and later his intention to whip him. A witness who was acquainted with neither of the parties testified that he saw the blow struck with a stick; that the assailant passed him and hit the deceased and ran. A witness by the name of Dickens was with the deceased at the time he was killed and in his testimony on the trial identified the appellant as the assailant. The appellant denied the assault and relied on proof of alibi. A witness who was in the church with the appellant a short time before the homicide testified that the deceased was also in the house just in front of the witness and appellant, and in full view and that the appellant while looking at deceased said to the witness: "He is here isn't he." The witness was present at the previous difficulty and had conversed with appellant upon the subject subsequently and said that shortly before the remark complained of was made that appellant had said a word or two about the deceased, though the witness disclaimed recollecting the purport of the remarks. We perceive no error in the admission of the evidence. It circumstantially appeared that the reference was to the deceased and went to show, at least, that appellant took note of the presence of the deceased. Some five minutes after the blow was struck, and after the assailant

had run away, the eyewitness Dickens was asked if he knew who struck the blow and he replied yes. Granting this to have been hearsay, we think its admission was not ˙reversible error. The same evidence came without objection from other sources than that complained of in the bill. Moreover, the appellant in the development of his case made it pertinent as bearing upon the credibility of the witness Dickens, in that by cross-examination and impeachment the appellant undertook to show that the witness Dickens had claimed that the assailant of the deceased was Loyal Gilbert, the brother of the appellant, and in supporting the witness the State proved by several witnesses that Dickens had claimed soon after the homicide that he knew the assailant to be the appellant. A reversal is not authorized˙ for the admission of competent, relevant evidence though it comes out of its order. Moore v. State, 7 Texas Crim. App., 14; Cox v. State, 8 Texas Crim. App., 254; Heartsfield v. State, 29 S. W. Rep., 777; Knight v. State, 64 Texas Crim. Rep., 541, 144 S. W. Rep., 967.

The State introduced evidence that shortly after the homicide a person ran across a certain field, and one witness who testified to this fact claimed that he had gone into the field on the night of the homicide for the purpose of responding to a call of nature and that while there he heard a party running. Subsequently evidence was introduced showing that there were tracks of a person running across the field, and the witness in testifying to the tracks also described tracks corresponding to those which would have been made by the witness last mentioned. The admissibility of the latter fact is challenged on the ground that its receipt is obnoxious to the rule which rejects testimony the sole purpose of which is to bolster the testimony of an unimpeached witness, appellant referring to Taylor v. State, 79 Texas Crim. Rep., 274, 184 S. W. Rep., 224 and Holmes v. State, 52 Texas Crim. Rep., 353, 106 S. W. Rep., 1160. The rule mentioned does not exclude cumulative evidence of a relevant fact, and in cases of this character, where the identity of the slayer is the main controverted issue, it is the privilege of the State to put in evidence all surrounding facts and circumstances which may bear upon the subject of inquiry. Proof of foot-prints found at or near the scene of the homicide,˙ as well as the presence of all persons, were admissible, and the fact that some or all of the foot-prints or other objects found could be accounted for by testimony of persons claiming to have been on the ground before or after the homicide would not be valid reason for excluding evidence that they were found. Ruling Case Law, vol. 13, p. 106; Wharton's Crim. Ev. vol. 2, p. 1681; Michie on Homicide, p. 829; Haley v. State, 209 S. W. Rep., 675.

The witness Alexander heard the lick and went immediately to the deceased and while there picked up a stick which he hid in a fence corner, and subsequently the same night he went with the witness

Safford and they got the stick. He said: "I do not know who picked it up, I think Mr. Safford. I was with him and saw him get it. Mr. Safford and I got it that same night." Safford testified that he went with Alexander and got the stick from the corner of the fence and delivered it to Alvin Banks, that he subsequently saw it in the hands of Tibbs, a deputy sheriff. He said that the stick exhibited to him on the trial was in his best judgment the same. Tibbs testified he got the stick which was exhibited to the jury, on the night of the homicide, from Alvin Banks. He had kept it and brought it to court. The witness Alexander was not able to identify the stick introduced in evidence as the one that he picked up. The indictment described the stick used with unnecessary particularity as three feet eight inches long, three inches wide and one inch thick. The record fails to disclose that any measurements of the stick introduced in evidence were given at the trial. Alexander made an estimate of it stating that he took it to be three or three and a half feet long, two and a half inches wide and an inch thick. The stick exhibited to the jury was also indentified by the witness Stocks who appears to have been with Alexander at the time it was picked up. We think there was no error in admitting the stick in evidence. Its identity and its dimensions as meeting those set out in the indictment were questions for the jury. Underhill on Evidence, sec. 314: Wharton's Crim. Ev., p. 276; 1 L. R. A. (N. S.) 419.

Appellant contends that the court was in error in rejecting his offer to prove the reputation of the deceased for violence. We are aware of no issue upon which this testimony would have been relevant. Irwin v. State, 43 Texas 236; Branch's An. P. C., p. 1177, and cases cited. Appellant offered proof that some thirty days prior to the homicide the deceased, at a point some six miles from the homicide cursed a man by the name of Wootem and told him "he would cut his head off and chunk his body with it." This, as well as the reputation of the deceased mentioned, we understand the appellant deemed relevant as tending to show that another not acting with the accused had opportunity and motive to commit the offense. In a proper case testimony showing such opportunity and motive of persons in such proximity to the homicide as to render the facts of any weight in determining the identity of the slayer or in excluding the accused should be received. Taylor v. State, 195, S. W. Rep., 1149; Wallace v. State, 46 Texas Crim. Rep., 341; McCorquodale v. State, 54 Texas Crim. Rep., 344; Ogden v. State, 58 Texas Crim. Rep., 118. There was no suggestion in the evidence that Wootem was present.

The case was not one in which the State relied upon circumstantial evidence alone. Evidence of the witness Dickens was sufficient to take the case out of this rule in that he was positive in his indentification of the appellant as the assailant of the deceased. He said in his direct-examination: "1 was with him when he was

struck. Ledger Gilbert struck, him. Ledger Gilbert came up from be-
hind us. When the lick was struck I looked around." On cross-exami-
nation, he said: "It is not true that I did not see the party who struck
him. I did see him. The first thing that attracted my attention was
the lick. I then looked around and saw the party who struck the
lick. He was turning the moment I got a glimpse of him. He ran
off. I saw him until he got up to the corner of the church. The
stick fell down and struck my hand. I swear it was Ledger Gilbert.
I swear it because I saw him and looked into his face. I saw his
features. I could see him as he was turning and I knew it was he.
There was light there. I think there was light shining on his head."
We think there was no error in excluding the testimony offered.

The court was not in error in refusing to permit the appellant
to prove that on a different occasion, and sometime subsequent to
that on which the appellant had uttered a threat against the de-
ceased, that he said to a third party that deceased's cursing him
hurt the deceased worse than appellant. This was properly excluded
as hearsay and self-serving. Branch's An. P. C., p. 58. The appellant
having introduced evidence impeaching the witness Dickens by proof
of statements contradictory of his evidence upon the trial, the
State was within its rights in proving the prior consistent state-
ments which are complained of. Branch's An. Texas P. C., p. 110.

The offer to prove that the witness Campbell had told the witness
Tibbs that Loyal Gilbert, brother of appellant, who was under
arrest, was not present at the time of the homicide, was properly
rejected under the rule against hearsay and against impeachment
of a witness upon a collateral issue. Branch's An. Texas P. C., p.
108.

We think there was no error in excluding evidence of the conver-
sation between appellant and his brother at the church, where the
homicide took place, and a short time prior thereto. Especially is
this true, as the substance of the conversation, showing that the
brother stated he expected to be absent and requested appellant to
do certain work for him at home, was developed.

The assignments of misconduct of the jury and the misconduct of
the court by causing the arrest of a witness during the trial raised
questions of fact upon which the court heard evidence which we
have carefully examined and deem it unnecessary to detail. Suffice it
to say that in our opinion it supports the conclusion reached by the
trial court that there was no new evidence given the jury in its re-
tirement and that the arrest of the witness was not brought to their
attention in a manner or at a time which was harmful to the appel-
lant.

Discovering no errors which authorize us to reverse the judgment
its affirmance is ordered.

*Affirmed.*

ON REHEARING.

October 8, 1919.

LATTIMORE, Judge.—Appellant has presented his motion for rehearing, contending principally that there is a variance between the stick described in the indictment as the instrument with which the alleged homicide was committed, and the stick exhibited before the jury, and described by the witnesses, and also of misconduct of the jury.

The indictment describes said stick as "three feet and eight inches long, three inches wide, and one inch thick." In claiming a variance, appellant relies upon the well known rule of law, to the effect that there must be a correspondence between the allegation and the proof, and that where a thing necessary to be described in an indictment is described with unnecessary particularity therein, the proof on the trial must correspond in order to be sufficient. Robinson v. State, 60 Texas Crim. Rep., 592, 132 S. W. Rep., 944.

We call attention in this connection to the rule which is of equal force and application, that in such case the proof is sufficient if it show that the weapon charged in the indictment, and the one shown by the proof to have been used, is such that the nature and result of its use is the same or substantially correspond. So it is held that an allegation of homicide with a gun is met by proof of the same with a pistol. Douglas v. State, 26 App., 109; also that an allegation of assault with a Winchester rifle, is met by proof of the commission of the same with a Cole's rifle. Brown v. State, 43 Texas Crim. Rep., 293; also that an allegation of death from poison mixed with water, is met by proof of death by poison mixed with coffee. Johnson v. State, 29 Texas Crim. Rep., 150.

In the instant case the stick exhibited to the jury and described by the witnesses, is variously estimated at from two and a half to four and a half feet long, an inch thick, and from two and a half to three inches wide.

We think the trial court correctly told the jury that if they believed the proof showed that the stick used was substantially the same as described in the indictment, that this was sufficient. Holliday v. State, 35 Texas Crim. Rep., 133; Chisom v. State, 77 Texas Crim. Rep., 397, 179 S. W. Rep., 103; Section 1589, Branch's Ann. Penal Code. Nor do we think there was error in permitting the stick to be shown to the jury, as the evidence connecting the same with the homicide was sufficient to take the question of its identity to the jury.

The remaining ground of appellant's motion, is that we erred in holding that the facts adduced before the trial court in support of the motion for a new trial, did not show that the jury received other

evidence after its retirement. We have reviewed the statement of facts bearing on this contention, and have come to the conclusion that we were in error in deciding this matter.

It is provided by Art. 837, Vernon's C. C. P., that in a felony case a new trial shall be granted "where the jury, after having retired to deliberate upon a case, have received other testimony, and it is held that if such testimony be so received and it appear that same is of such nature as that injury may have resulted, and that fact is shown on motion for new trial, this Court will not speculate as to its effect upon the jury, but will reverse the case. McWilliams v. State, 32 Texas Crim. Rep., 269; Mitchell v. State, 36 Texas Crim. Rep., 278; McDougald v. State, 81 Texas Crim. Rep., 79 194 S. W. Rep., 944.

The question for us is; this "Did the jury, after its retirement, receive other testimony than that given on the witness stand?" If this question be answered affirmatively we must reverse the case. The trial court heard the testimony of the jurors *pro* and *con* on this issue, and same is set out in the record before us. The contested question was as to whether juror Lindsay had made statements in the jury room, that certain pretinent facts stated and discussed by him and the other jurors, were true or untrue, because known personally to said juror.

In support of said motion juror, Snead testified:

"I was on the jury that convicted the boy. Before we arrived at a conviction in there there was some right smart discussion how the ground was and where the wagon was and where the light was. I believe Mr. Lindsay made the remark that he knew the location of the church and things down there. After he made that remark he explained in this way how it was located: If the wagon was located where the testimony showed, he knew from his knowledge where the wagon was, just like I knew it. He never changed me a bit on that. He said he knew where the church was at and the ground. After telling us that I believe he used the table. He said then if the wagon was where they testified it was, he knew what direction it was from the church . . . He said if it was at a certain place, he had been there and knew what direction it was from the church and where it was situated. I think he said something about the windows in the church, and he said he knew where they were. He did not say if the wagon was where it was testified, the light would not shine there; I think he said where the light would shine out; he said it would shine there at the back of the wagon. He did not say anything about where Mrs. Gilbert said it would shine. *He said the light coming out of the window would shine out behind the wagon.* I don't think it would not shine out on the wagon. He did not say it would not shine there, I don't think. I think he told us he knew himself where the windows were in the house; I know he

he said that. He did not say that the light would not shine out and strike the wagon nor that it would, but from the way he located the windows it would not. He showed us where the windows were located, and *from where he located the windows in the house, from what he knew of the house himself, the light would shine behind the wagon, and would not shine on the wagon,* I think."

This witness testified that what was said by Lindsay did not influence him at all, and, further, that he did not know whether Lindsay was talking from his individual memory or from the testimony, but thought it was from the testimony.

Juror Waters testified:

"Mr. Lindsay explained about where the windows were in the house. I know he did. I think he had been there, and knew where the windows and doors were in the house. I think he showed us if the wagon was standing at the place they testified to, how it would be as to the windows, . . . It was after he explained about the windows that I said I was satisfied . . . He did explain where the windows were, and explained that; and it was after that that I agreed to a verdict."

### Cross Examination.

"I understood that Mr. Lindsay's examinations about the windows the way the light would shine, that he was arguing it from what the witnesses said. I did not receive any information and was not goverened by anything said by Mr. Lindsay in the case . . ."

### Examination by the Court.

"I understood that Mr. Lindsay's examinations about the windows was based on his knowledge gained from the testimony in the court, and *his being acquainted with the place too.* His being acquainted with the place would make him more readily understand it than anybody else."

### Re-Direct Examination.

"It seems to me like Mr. Lindsay, while talking about the windows, said something about the light would not shine out there where the wagon was, that it would not shine out there because he knew where the windows were himself."

Juror Cargile testified:

"I was on the jury that convicted Ledger Gilbert. I heard Mr. Lindsay state in the jury room that he was acquainted with all of the parties; he said he knew them all. I did not hear him state what he thought of any of the parties that testified, as to them being honest or truthful or anything that way; if he mentioned that I did not hear him. I did not hear him say how long he had known them; it was my understanding that he was acquainted with them all. I heard him say he was acquainted with the church and grounds and the location of it. After he said that I think he proceeded to show us how it was located. He showed us where the wagon was standing

in relation to the church. We were all discussing that and we all wanted to know where the location was, and I think he explained it to us to our satisfaction, if there was any dissatisfaction. I think we all thought we understood exactly where it was, and we wanted to know for sure. He did not say that the plat that was offered in evidence was backwards, and that he knew how it was himself; if he did, I did not hear it. He did say he was acquainted with the location. He took the table and showed us on the table how the ground was and where the wagon was standing. I suppose he knew that himself. After he explained it, the way he knew it was situated, it was satisfactory to us.''

This witness also stated on cross-examination, in response to questions by the court, that he was not influenced by anything except the testimony of the witnesses, that he understood Lindsay was explaining matters from testimony and not from his personal knowledge.

Juror Hightower testified as follows:

''While the jury were in the room deliberating on their verdict Mr. Lindsay possibly did show the jury how the ground lay down there and the field and which direction it was, plotting it off on the table and using the table for the north part of the field, while I did not understand that he was showing us from what he knew about the field. I asked the question; I was trying to locate the wagon that Mrs. Gilbert was in more to my satisfaction as regards the light that Mr. Inman was carrying, and Mr. Lindsay explained it to me; but I don't know from what point he was explaining it. I understood it to be from what he understood it to be the witnesses' testimony. I remember Mr. Lindsay saying he knew the lay of the land down there, but as to some of them speaking up and saying they did not understand how the boy got away and which way he went, and Mr. Lindsay going on to explain the route he went and stating he knew the location himself, I don't remember that. He did say he understood the lay of the land and was acquainted with the place. After he said that I really don't know whether he proceeded to show me how it was located or not. I know after he said that I told him what I was trying to find out was the location of the wagon, and he explained that to me. He explained to me where the light was, and he said something about the distance from the church, but I don't know what he said. He might have stated how far it was from the church to the cemetery and out to the trees where Hugh Inman was; we were mostly all talking at once and lots could have been said that I did not hear. He did say that he knew the ground and was acquainted with the location and knew where the wagon stood from what they testified, and he proceeded to show where the wagon was . . .''

''I had the one idea in my mind to locate the one wagon if I could. He showed me where the light and wagon was.''

This juror further stated on cross-examination that he was not influenced by what was said by Mr. Lindsay, and that he understood that the discussion of the location of the lights, was from the evidence introduced upon the witness stand.

The juror Lindsay, whose statements in the jury room were objected to, also testified in opposition to the motion. He said as follows:

"I did not know, of course, anything about where the wagons stood; I knew that from the witness stand; that is all I could go by. If it stood at the place where some of them testified, I could not help but know from my own knowledge where it was at. Someone asked me the question where Mr. Inman was with the light, how came the question about the windows to spring. They could not locate just where he was, and of course his testimony was there to go by, and I explained from his testimony where he swore he was. From his testimony, if he swore he was at a certain place, I knew where that place was, and I explained it to them according to the testimony. Knowing the ground, I knew about where he was standing. *I explained to them where he was from Mr. Inman's testimony and from what I knew of the ground.* Mr. Hightower asked the question, said he could not locate it. I told him where Mr. Inman swore he was. I could not tell you whether I said if he was at that place I knew where he was, but I was governed by the evidence. The location of the windows was taken up and there was a plat there and I showed them the best I could according to that plat, and explained it, and there was something mentioned about the table, and *I told them how the house stood;* of course I could not help but know that. I was acquainted with the location of the windows."

We have examined the testimony of these witnesses carefully, and our conclusion is that after the jury had retired the juror Lindsay made statements to them of facts stated to be known of his own knowledge. These facts stated as within the knowledge of the juror were not of an irrelevant or immaterial nature or character but were "testimony," as the word is used in Art. 837, Vernon's C. C. P., *supra.* We do not believe it incumbent upon us to speculate as to the effect of such testimony upon the other jurors, nor that a new trial should be denied because they may have stated the same did not have any effect upon them. If it be shown in any case, as we think it has been shown in this case, that the jury received testimony other than from the witness stand, our only course is to reverse the case.

The motion for rehearing is granted and the judgment reversed and remanded for another trial.

*Reversed and remanded.*