HOBB MCCULLOUGH v. THE STATE.

No. 20088. Delivered June 7, 1939.
Rehearing Denied October 25, 1939.
Request for Leave to File Second Motion for Rehearing
Denied (Without Written Opinion) November 8, 1939.

The opinion states the case.

*Mark Smith* and *Jno. M. Hatter*, both of Waxahachie, for appellant.

*Lynn B. Griffith*, and *Forrester Hancock*, Crim. Dist. Atty., both of Waxahachie, and *Lloyd W. Davidson*, State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is murder; the punishment, confinement in the penitentiary for fifteen years.

It was charged in the count of the indictment under which appellant was convicted, in substance, that appellant, with malice aforethought, killed Cadel Lambert by beating him with a leather belt.

Deceased, who was a negro, was a county convict, being restrained on the county farm near Waxahachie, Texas. During the day appellant, who was a guard, would take the prisoners from the farm to a rock pit, where they were required to work. About 11 a. m. on the 30th of April, 1938, while appellant was in charge of the prisoners at the rock pit, deceased appeared to be unable to work, and advised appellant that he was ill. According to the testimony of witnesses for the State, when deceased quit working appellant entered the rock pit and hit him with his fist. About 2 p. m. deceased again told appellant that he' was too sick to work. Thereupon appellant called deceased out of the pit, required him to lie down, placed his left foot on his shoulder and beat him on the back and shoulders with a pistol belt. Touching the extent of the punishment thus administered, a witness for the State testified as follows:

"The first thing Captain Hobb (appellant) whipped him with was a belt, his gun belt. He whipped him until he gave out. I don't know how many licks he hit him. After that the negro (deceased) tried to work. He kind of worked but he staggered around like he was sick or something, I don't know."

The version of witnesses for the State was to the further effect that appellant told deceased he was going to kill him or make him work. After whipping deceased with the belt, appellant procured some large sticks with which he severely beat him. One of the witnesses for the State testified: "Deceased was down on the bank and he was hitting him on the back and the neck and shoulders and on the back part of the head with a stick." This same witness said: "The deceased would try to work that day. He worked some in the morning and he

worked a little in the evening, I think. I heard the deceased curse the defendant and call defendant a bad name after the second whipping. He called him a s—b—." After appellant had beaten deceased with a stick deceased tried to work. Finally he said to appellant: "Captain, I just can't make it." Appellant then ordered one of the prisoners to get another stick, saying to deceased, "I'll bet you will work." Calling two of the prisoners, appellant required them to hold deceased down while he beat him with the stick. He then ordered deceased back into the rock pit, but deceased was unable to work. He turned around, saying, "Captain, I just can't make it." Appellant again took him out of the pit and proceeded to whip him with a stick. After administering such punishment he struck deceased in the back of the head with a pair of brass knucks, knocking him into the rock pit. Touching this incident, one of the witnesses said: "After he knocked the negro down in the pit with this pair of knucks, Cedel Lambert never did get up. I never heard him say another word." Another witness said: "While Captain Hobb was whipping Lambert that last time Lambert's bowels moved. He would try a little to get up and Captain Hobb would tell him to get back in the pit. After that Captain Hobb never done nothing more than throw rocks at Lambert. I never did see this negro Lambert try to walk and I never did hear him say another word after that last whipping."

It appears that the sticks used by appellant in whipping deceased were dogwood or hackberry. One witness for the State testified that appellant whipped deceased five or six times. As to one of the whippings with a stick, a witness testified: "This time he (appellant) hit him about 25 or 30 licks—wore the stick short; then hit him several blows about the head." One of the State's witnesses testified, in part, as follows:

"Captain Hobb told Calton to cut him a stick, and he gave Edward a knife to cut the stick with, and Edward brought the stick back, but he cut his hand; and Captain Hobb told me and Bozo to bring him (deceased) out and lay him on the bank. And so we taken him out and laid him on the bank, and Captain Hobb whipped him with a stick until he wore it down to a short nub. He placed him over on his back; then he made him get back in the pit again; and he told Edward to get him another stick but Edward's hand was bleeding, so Vernon Knight cut a stick; and Captain Hobb told me and Bozo to come back and lay him out again; so we went and got him. Bozo held him by both hands and I held him by the feet; and

he whipped him again. This time he hit him about 25 or 30 licks—wore the stick short, then hit him several blows about the head."

Touching the condition of the deceased after appellant had beaten him with the sticks, a witness testified: "The negro was scrambling around. He could not get over where the other hands were working; and the deceased's head was drawn back and he was scrambling around and did not realize what he was doing, and the defendant told him to get back; told him to get out of the other negroes' way. The deceased was not up walking, he could not walk; he just crawled or jumped around on his all-fours part of the time, and part of the time he was rolling around on his back."

About 5 o'clock p. m. deceased was placed in a truck with other prisoners and carried to the convict farm. He appears to have been semi-conscious and in a dying condition. One of the witnesses for the State testified: "They brought him back to the county farm in a special truck. Me and three more boys taken him out of the truck on the opposite side of the mess hall and laid him down on the grass, and when we got ready to go wash Captain Hobb said, 'Carry him to the wash house.' We first laid him on his back and turned the warm water on him; then we laid him over. The first thing we laid him on his stomach—no, the first thing we turned him on his back and run water on him; then we turned him over on his belly and rinsed him off with cold water. Captain Hobb told him to get up; he didn't do it, so he struck a match and put it under his left arm, but the hair being so wet forced that match and it went out. * * * Captain Hobb got a 'bat'—not a baseball bat; it was a piece of leather about two or three inches wide. Captain Hobb came back and had it under his arm. He told the boy (deceased) to get up and he hit him four or five licks right on his naked limbs. That is when he struck the match and put it under his arm, and he struck another match and put it under his nose; but him blowing the water out of his face caused that match to go out. Then, while that match was going out, he taken the bat and with both hands hit him another blow on the naked butt. After that Lambert never did get up. That taken place around about five or six o'clock—just a little before supper. The negro prisoners sleep up on the second floor out on the county farm. Lambert was up there that night. Bozo and Vernon Knight and me took him up there. I guess that was about six o'clock. It was after supper. Doctor West

come to see him first. Then Doctor Jackson come later. Lambert died that night."

It appears that before the deceased was taken to his sleeping quarters he was carried into the kitchen. While he was there another guard, Captain Black, came in and ordered him to get up. When deceased made no response Black proceeded to beat him on the feet, legs and body with a broom stick. He then kicked deceased on the side of the head. It does not appear that Black knew deceased had already been beaten by the appellant.

Dr. West testified that he was called to the convict camp about sundown. As to the condition in which he found deceased, he said: "I made an examination of his body, of his pulse, respiration, looked at his face, but did not strip him. I saw his head—just as good as I could see up there with only a flashlight—it was dark up there in the cell. * * * I knew that he was in a coma, almost unconscious, his eyes blared; and I had a flashlight, and when I turned it in his face he did not talk or give any resistance whatever in his face or body while I was about him. His respiration was slow, a slightly raised temperature, no evidence of pain. Of course, he being almost totally unconscious, I could not get any manifestation at all; and I decided his trouble was inside his skull or head—that was my judgment, and I told them I would be back in the morning. I went back next morning and they told me he was dead—that there was not anything that I could do."

A post mortem examination was performed in the undertaking establishment. As to the wounds found upon deceased, and the condition of his brain, Dr. West testified: "I found marks, bruises and cuts on the legs, thighs, abdomen, on the back, hips, etc.; on the head there was evidence of bruises on the right side and left in the back and right in the forehead. These bruises or cuts were largely bruises—no torn flesh; but on deep pressure you could find depressions—you could find evidence of damage to the skull and forehead—the most prominent bruises right in the edge of the hair and on the scalp. On depression you could not find evidence, external evidence, that the skull had been cracked or crushed; but it could have been cracked and you could not feel it through the flesh, if it was crushed. There was evidence of a slightly broken skull right here (indicating side of head), the external evidence on the scalp did not indicate much injury—the injury to the scalp was slight. We made an incision right here and dissected the scalp off, and pulled it down over his face, and while doing

that we could see places where, from the external examination it was seemingly normal, but the tissues underneath these places were injured greater than one would expect to find. Then on top, sawing around the skull so as to get the top off, we discovered that the covering of the brain itself had what we technically call contusions or bruises sufficient to break some of the blood vessels, causing what we call extravasation of the blood through the brain. The damage to the vessels was sufficient to break the walls so that the blood ran out by the process of extravasation through the brain tissues around it. In my opinion, and with my experience as an expert, the deceased's death was caused by damage to the brain inside the skull, injury to the brain. The most fatal injury was possibly in this respect right here, the right parietal frontal lobe. There was a bruise here in the frontal lobe, one here on the left, and one in the back of the head right here. * * * In my opinion this was the severest damage to the brain on the right side above the ear and a little forward, about here where my finger is. At least that is my opinion. The left arm was paralyzed when I examined him that evening, Saturday evening. * * * His right arm was drawn right rigidly down on to his belly; made me think he had some injury he had gotten out there; when I would push his hand out of the way and would turn it loose it would come right back down with the fingers grasped this way, indicating some trouble with the nerves going to that arm, but the trouble causing the condition of the left arm had gone so far as to produce the paralysis, * * * In my opinion he would have died from any of those wounds, but he might not have died so quickly as he did from the one on the right. Any of those wounds would probably have killed him, especially to the front and side here. Now, the injury to the back, unless the damage extended down through the spinal cord where the spinal nerves come off—but I did not determine whether or not it had come down that far." The doctor testified, further, that in his opinion the wounds on the body were not sufficiently serious to have caused the death of the deceased. However, he said: "The whippings that man received on the legs, back, feet and other parts of his body would have lowered his vitality so that it would have facilitated or helped produce his death; and would have produced exhaustion and impaired his power of resistance. If he had not received those head wounds those body wounds would not have killed him."

Dr. Jackson, who also attended the deceased, testified as follows: "From my examination of him there that night and

from the post mortem I arrived at the conclusion that the cause of the negro's death was concussion of the brain; concussion and contusion are the same, either one. I would say that either one of the three wounds would kill him but all together they did kill him. In examining the body other than the head and face, we found that he was beaten all over his body, front, back and legs. It looked like those wounds were caused by him having been hit by something. More than likely those wounds on his body contributed to his death, the shock, yes. * * * I did not say that if he had not received those licks on the head the wounds he had received on the body would have killed him. * * * The shock of those whippings would have contributed to his death. * * * Those licks on his body would produce that shock and the shock would contribute to his death."

Appellant admitted that he whipped deceased. He testified that he told deceased if he was sick to sit down; that deceased was standing up with a crowbar at the time; that when he spoke to deceased, deceased threw the crowbar down, fell over and struck his head against a rock; that deceased later got up and he ordered him back into the pit; that deceased grabbed him, and he struck deceased with brass knucks; that deceased fell backward but got up; that later deceased grabbed a rock and hit him with it; that he then struck deceased about fifteen licks with a stick; that deceased cursed him; that he got another stick and hit deceased three licks, saying, "Negro, you take that back or I will beat hell out of you;" that deceased replied that he didn't have to work for any damn white man; that he wasn't afraid of any damn law. At this juncture we quote from the testimony of appellant, as follows: "We come on home. At the farm all of them got out. I stayed in the truck. I told Bozo to take him out of the truck. The negro reached back and got hold of his feet. There was about five or six shovels in the back of the truck. When Bozo went to pull him and take him out he grabbed one of these shovels. I pulled him loose. They laid him down on the ground. I told A. J. to get him some clean clothes. I went ahead and got him a pair of pants and a shirt. I told them to carry him around to the bath house. They carried him in and started to give him a bath. He was laying there. He laid down on his back and I told Bozo, 'I can make him get up and be good, and he has just sulled.' So I pulled out a match and struck it and put it up to his left side. I didn't put it clean up to him. That match went out and I struck a second match and held it up to his face and he moved, jumped over. I told Bozo, 'Just wait,' and

I went up to the guard house and got the bat, a piece of leather about that long (indicating) with a wooden handle ten or twelve inches long. That leather bat is something like three inches wide. When I got back to the wash house he was laying on his stomach. He had slid out from under the water and I hit him three licks with the bat. He told me that water was too hot."

Appellant testified further that he had no intention of killing deceased. He said: "I didn't want to whip him. He didn't want to work that morning. I had some trouble with him about one o'clock. I just whipped him to get him to behave himself and work."

There were counts in the indictment charging that appellant killed deceased by beating him with a wooden stick; by beating him with a leather belt; by beating him with brass knuckles; and by beating him with brass knuckles, a wooden stick and a leather belt. All counts being submitted to the jury, they specifically found appellant guilty under the count charging that he killed deceased by beating him with a leather belt. It is appellant's contention that there was a fatal variance between the instrument laid and the instrument proved, it being his position that the testimony of the attending physician showed that the blows on the head with brass knuckles and wooden sticks caused the death of the deceased.

At common law, in an indictment for murder, it was necessary to allege the means or weapons used, and such allegation is requisite in an indictment for murder in this State when the means are known. See Douglass v. State, 9 S. W. 489. We quote from the Douglass Case as follows: "But when the indictment is required to contain such an allegation, Mr. Bishop says: 'This is one of the cases in which proof of only the substance of the issue is required. Though at the trial the weapon appears not to have been the same as charged, yet to have produced the same sort of wound which it would have done, followed by the same sort of death, the averment is sustained.' 2 Bish. Crim. Pr. (3d Ed.) sec. 514. Mr. Wharton says: 'The common-law rule in pleading the instrument of death is that where the instrument laid and the instrument proved are of the same nature and character, there is no variance; where they are of opposite nature and character, the contrary.' 1 Whart. Crim. Law, (8th Ed.) sec. 519. 'If the act of the prisoner and the means of death be proved in substance as alleged, the violence and death being of the same kind as alleged, a mere variance in the name or kind of in-

strument will not be material, (Egerton v. Morgan, Bulst. 87,) if the instrument was capable of producing the same kind of death, (Mackalley's Case, 9 Coke, 67a, Gilb. Ev. 231;' 1 Archb. Crim. Pl. & Pr. 8th Ed. Pom. notes, note 280.)"

In Bishop's New Criminal Procedure, Second Edition, Vol. 3, page 1536, it is said: "The proofs need sustain only the substance of the issue. Thus, if at the trial the weapon disclosed is not the same as charged, yet it produced the same sort of wound, followed by the same sort of death, the averment is sustained; * * *."

In Wharton on Homicide, 3rd Edition, page 856, the rule is stated as follows:

"The common-law rule, in pleading the instrument of death, is that, where the instrument laid and the instrument proved are of the same nature and character, there is no variance; where they are of opposite nature and character, the contrary. Thus, evidence as to a dagger will support the averment of a knife, but evidence as to a knife will not support the averment of a pistol. But where the species of death would be different—as, if the indictment alleged a stabbing or shooting, and the evidence prove a poisoning or starving,—the variance is fatal; and the same if the indictment state a poisoning, and the evidence prove a starving.

"The questions are as to whether the nature of the injury would be the same, and the mode of applying violence the same. * * *."

We quote from 13 Ruling Case Law, page 901, as follows: "The rule of the common law, as recognized and applied in England, requires in an indictment for murder or manslaughter that the instrument, weapon or other means by which death was caused, be particularly specified and described. * * * The law always has been fairly liberal to the prosecution so far as the question of variance between the instrument of death alleged and that proved is concerned; and where the instrument laid and that proved are substantially of the same character, capable of inflicting practically the same nature of injury in substantially the same manner, there is no variance. The question in each case is whether the nature and character of the injury and the manner and means of inflicting it as proved are practically and substantially, though not identically, the same as that alleged.* * *"

We need not give our approval to the holding of each of the cases cited by Mr. Bishop and Mr. Wharton in which the com-

mon-law rule has been invoked to determine whether there was a material variance between the instrument laid and the instrument proven. It is held in some of the cases cited by Mr. Bishop and Mr. Wharton that "if a wound or bruise be alleged to be given with a sword, and it prove to be with a staff or axe," the variance is immaterial; that if the means charged is a wooden stick and a stone is proven, the variance is not material; that if it is alleged that the homicide was committed with a piece of iron and the evidence is that it was with a piece of plank there is no variance; that a charge of an assault with a gun is not sustained by evidence of an assault with the hand; that evidence as to a dagger will support the averment of a knife; that evidence as to a knife will not support the averment of a pistol.

Looking further to our own decisions, we find that in Holliday v. State, 32 S. W. 538, the conviction was for an aggravated assault. A variance between the proof and allegation touching the means used was asserted by the accused. This court, speaking through Judge Henderson, answered such contention as follows: "Whether the weapon used was a picket, a pole, or a piece of scantling, it was the same character of weapon; and, in our opinion, the same rule should govern a case of this character as would govern a case of murder. In such a case, if the fatal wound is described as inflicted with one character of stick or piece of wood, another kind of stick or piece of wood inflicting the same character of wound could be proved, and there would be no variance. See 2 Bish. Cr. Proc. p. 218, section 514, note, and the authorities in our State follow the same line."

In the case of Brown v. State, 65 S. W. 529, this court cited with approval the common-law rule adverted to and applied in Douglass v. State, supra. In the course of the opinion in Brown's Case, the court said: "In murder cases, however, great latitude is allowed in the description of the instrument with which the person was killed. For instance, the general doctrine laid down by all the elementary writers is, if the instrument alleged in the indictment and the one proven to have been used are of the same nature and produce wounds of a similar character, there is no variance, but where they are of an opposite nature and character, the contrary. Thus evidence of a dagger will support the averment of a knife, but evidence of a knife will not support the averment of a pistol. * * * Whart. Hom. Section 810; Bish. New Cr. Proc. 488, Subd. 2. In this State the indictment for murder must state

the means used in committing it. * * * But we follow the received doctrine authorizing latitude in the proof of the averment as to the means used. Douglass v. State, 9 S. W. 489."

In Gilbert v. State, 215 S. W. 106, which was a murder case the contention was made that there was a variance between the instrument described in the indictment and the instrument proven. In reaching the conclusion that the variance was immaterial, this court cited Douglass v. State, supra, and applied the common-law rule to which we have heretofore adverted. In the course of the opinion in Gilbert's Case, Judge Lattimore referred to the general rule that there must be a correspondence between the allegation and the proof and that, where a thing necessary to be described in an indictment is described with unnecessary particularity therein, the proof on the trial must correspond in order to be sufficient. After making such reference to the general rule, Judge Lattimore used language as follows: "We call attention, in this connection, to the rule, which is of equal force and application, that in such case the proof is sufficient if it show that the weapon charged in the indictment, and the one shown by the proof to have been used is such that the nature and result of its use is the same, or substantially correspond."

Looking to the present case, it might be plausibly contended that a variance would not be presented if the proof showed that the beating of the deceased by the appellant with wooden sticks alone inflicted the injuries which resulted in his death. The leather belts, as well as the wooden sticks, were used by appellant in beating the deceased. The mode of applying violence was the same. Appellant whipped deceased with a leather pistol belt and with the bat, which consisted of a handle and a wide piece of leather. The nature of the injuries—broken blood vessels in the brain—resulting in the death of the deceased might have been the same if the leather belt and bat had been applied to his head as vigorously and frequently as were the wooden sticks. It might be plausibly contended that the sticks and belts were not of opposite nature and character when used to inflict punishment. However, in view of the testimony of the attending physicians to the effect that the wounds and bruises inflicted on the back and limbs of the deceased were contributing causes of death, we leave undecided the question whether, under the common-law rule quoted with approval in Douglass v. State, supra, an averment that a beating resulting in death was with a leather

belt and proof that such beating was with a wooden stick fail to present a fatal variance.

Bill of exception No. 1 is concerned with the action of the court in overruling appellant's first application for a continuance based on the ground that he had not had adequate time to prepare for trial. It appears from the bill that appellant was accorded the time allowed by law for making preparation for his trial. The court appended the following qualification to the bill of exception: "The above and foregoing bill of exceptions is approved with this express qualification, to-wit: The trial court, after hearing all of the evidence, was of the opinion that defense counsel had ample time within which to adequately prepare their client's defense; and that such defense was adequately prepared and presented; and that no statutory right * * * was in anywise denied to the defendant or his able lawyers. No prejudice was done to the defendant, and he was ably and diligently represented by two most able counsel several days before the trial of the case, during such trial and after such trial; and in no manner was it intended to deprive the defendant of any right accorded to him by any law." As qualified, the bill of exception fails to present error.

In bill of exception No. 2 appellant complains of the action of the trial court in overruling his application for a change of venue. It appears from the qualification appended to the bill that the court heard testimony on the motion. This testimony is not brought forward. However, the qualification appended to the bill reads: "As is shown by the statement of facts referred to, many impartial and disinterested citizens, who constituted the overwhelming weight of the credible testimony on this matter, testified that the defendant could receive a fair trial and that no prejudice existed against him. Such motion for a change of venue was timely and legally controverted by the State, and the State proved that there was no reason why such venue should be changed. The jury who tried the case were actually chosen from some first forty, who were examined out of a special venire of some two hundred veniremen in all; and the defense had several unused peremptory challenges left when the selection of such twelve sworn jurors in Ellis County was completed." As qualified, the bill clearly shows that there was no abuse of discretion on the part of the trial judge in denying the application.

Bill of exception No. 18 relates to the court's action in refusing to permit appellant to prove the deceased's general

reputation as a violent and dangerous man. The court qualifies the bill to show that the appellant did not except to the ruling of the court. As qualified, the bill is without merit. At all events, we are of opinion that the testimony failed to raise the issue of self-defense. Hence proof of deceased's general reputation in the respect mentioned was not admissible.

After carefully examining all of appellant's contentions, we are constrained to hold that reversible error is not presented.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

GRAVES, Judge.

We have gone over the entire record, in the light of the vigorous motion for a rehearing filed herein. The matters complained of herein have all been considered in the careful and exhaustive original opinion, and we can see no good reason for a further writing thereon. The objections to the court's charge should be directed to the revised charge, if such charge has been revised, and one can not rely upon such objections directed to a charge which has been withdrawn by the court, and which has not been read to the jury. See Johnson v. State, 40 S. W. (2d) 135.

We commend appellant's attorneys for their diligence in the trial of this cause, and the careful preparation of their briefs herein, but see no reason for receding from the position taken in our original opinion, nor for further writing hereon.

The motion is therefore overruled.