## Wayne Todd v. The State.

No. 6886.   Decided January 31, 1923.

Rehearing denied February 28, 1923.

**1.—Murder—Confession—Corroboration.**

Where a witess for the State testified that defnedant came to him, saying that a man some distance out on the road wanted some gasoline that the witness took it to him and the man paid him for it, this was simply a corroboration of defendant's confession, and there was no error.

**2.—Same—Demonstration of Third Party.**

Where, upon trial of murder, after the public in the courthouse had been cautioned not to make any demonstration, the widow of the deceased began to weep audibly, whereupon the sheriff directed her to restrain herself or retire, and the court thereafter called upon her relatives to prevent her from entering the court room if she could not control her feelings, and thereupon she made no further demonstration, there was no error.

**3.—Same—Insanity—Charge of Court.**

Where, upon trial of murder, the defendant pleaded insanity and the court's charge on same was in approved form, there was no reversible error.

**4.—Same—Evidence—Corroboration—Circumstances—Confession.**

Where the body of the deceased was found some days after he had been missed, and among other facts describing the surroundings, there was testimony that there were some red ants around his head; that there was a hole in the ground four or five inches deep where his feet went, and where the left hand fell, there was gravel all raked up along the arm, there was no error, as a complete description of the deceased, the locality in which he was found, etc., was admissible in evidence on the issue of corroboration of the confession.

**5.—Same—Jury in Their Retirement—Written Confession.**

Upon trial of murder, there was no error in permitting the jury to take with them in their retirement the written confession of defendant, and introduced in evidence.  Following Holder v. State, 81 Texas Crim. Rep., 195.

**6.—Same—Argument of Counsel—Not Reversible Error.**

While the argument of a private prosecutor that the father of the defendant had plenty of money with which to hire high-priced lawyers to defend him was improper and not within his legitimate scope, yet it was not of a character so material as to injuriously affect the result.  Following Howard v. State, 53 Texas Crim. Rep., 385, and other cases.

**7.—Same—Misconduct of Jury—Argument in Jury Room.**

Where, upon trial of murder a discussion among the jurors was of an argumentative character expressed after finding defendant guilty, and while discussing the amount of penalty, and the court heard evidence pro and con, and thereupon overruled the motion for rehearing, there is no reversible error; in the absence of an abuse of discretion.

**8.—Same—Case Stated—Misconduct of Jury—Argument of Juror.**

There was testimony that the foreman in the course of his argument in the jury room stated that if the jury failed to give the death penalty a mob would hang the defendant; that the offense was committed by three of them and that unless this, the first defendant, was given the death penalty none of them would receive it; that the Governor would correct the matter if a mistake was made, etc.; and this occurred after the jury had found the

defendant guilty and were deliberating upon the penalty, and the discussion was by way of argument. Held, that under the facts of the instant case there is no reversible error.

### 9.—Same—Rule Stated—Judicial Discretion.

It is within the judicial discretion to overrule a motion for a new trial based on the claim of misconduct of the jury, and the action of the trial court will not be overturned on appeal unless it be shown to be clearly wrong. Following Reese v. State, 87 Texas Crim. Rep., 245, and other cases.

### 10.—Same—Public Policy—Motion for a New Trial.

By virtue of our statute on motions for new trial and its interpretation by the decisions of this court, the scope of the rule of public policy announced in the text is very much restricted in its application; notwithstanding its modification the rule has not been abrogated entirely, and when it does not run counter to the statute as interpreted by the courts it still operates. Following Watson v. State, 82 Texas Crim. Rep., 305, and other cases, and the rule is sufficiently vital in this State to preclude a reversal on account of arguments used by the jurors.

### 11.—Same—Insanity—Sufficiency of the Evidence.

There was introduced corroborative evidence of defendant's confession in practically all of its details; he relied upon the defense of insanity, and introduced a number of witnesses supporting this defense; the State also introduced a number of witnesses who expressed the opinion that defendant's mind was sound and that he was able to distinguish right from wrong, and the evidence being sufficient there is no reversible error.

### 12.—Same—Newly Discovered Evidence—Conduct of Defendant.

Where defendant filed a motion for a new trial on account of newly discovered evidence, and all of the so-called newly discovered evidence related to the conduct of defendant, which was in no material sense dissimilar from that which was described by the numerous witnesses who testified in his behalf, there was no error in overruling the motion.

### 13.—Same—Rehearing—Practice on Appeal—Misconduct of Jury.

After considering appellant's motion for rehearing, this court concludes that it was necessarily manifest to all of the other jurors that if one of their number said, "If we don't hang this man the other two will not be hung when they are tried," etc., that these were but purely speculative and conjectural opinions and expressions, not of past facts but of future probabilities, and that these utterances were merely argumentative, and not in the nature of new evidence, and the motion for a rehearing is overruled.

Appeal from the District Court of Parker. Tried below before the Honorable F. O. McKinsey.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Hood & Shadle,* for appellant.—On question of misconduct of jury: Mitchell v. State, 36 S. W. Rep., 456; Hardiman v. State, 53 id., 121; Blocker v. State, 61 id., 391; Buessing v. State, 63 id., 318; Duncan v. State, 184 id., 195, and cases cited in opinion.

*R. G. Storey,* Assistant Attorney General, for the State.

MORROW, Presiding Judge.—The appellant was indicted for the

murder of James McNeal, and upon his conviction, the jury assessed against him the penalty of death.

The State introduced in evidence the written confession of the appellant in which he declared that he, in company with one, Forrest Dawson, and one, McElhaney, in accord with a pre-arranged plan to commit robbery, got into an automobile driven by the deceased, James McNeal, with his consent, on the pretense that they wanted him to take them to a place on the road where they had a broken car, and that while in the automobile with McNeal and while he was driving it, he (McNeal) was struck over the head by one or both of appellant's companions. Appellant, acting in concert with them, stopped the car and the deceased was taken out and placed in a pasture near the road where it was subsequently found and identified. Some thirty-seven dollars in money belonging to the deceased were taken from his pockets and the appellant and his companions took possession of the car and drove it to Fort Worth and afterwards hid it at a point not far distant from that city.

In the confession the appellant described in detail his movements for several days antecedent to the homicide. He and Dawson had been together during the greater part of the time. He related in the confession places to which he had gone and acts that he had done and persons whom he had met, and such transactions as he had had with them. Among other things, he related riding in an automobile with a man from Graham. On this subject, we quote the following from appellant's confession:

" . . . and he carried us on the road to Weatherford when he ran out of gasoline; the man gave me a dollar and I went to the store on Clear Fork and he was not there and I caught a car back to where the man was, and I told the man that the storekeeper was not there and I went on to Weatherford with this man, he was a 'phone man of some kind, but I don't remember his name; at Weatherford I stopped at the Quick-Service Garage and there talked to Tom McGill and he went back with the gasoline."

McGill was called as a witness for the State and testified that the appellant came to him and said that a man some distance out on the road wanted three gallons of gasoline; that McGill took it to him and the man paid him for it. That the man paid for it was objected to upon the claim that it carried with it an implication that appellant had stolen the dollar which the man gave him. It was competent for the State to corroborate by legitimate evidence the statement in the confession. We fail to gather from the confession the inference which appellant's objection suggests. However, inasmuch as the court withdrew from the consideration of the jury the statement by McGill that the man to whom he took the gasoline paid for it, we regard the bill as revealing no error.

Bill No. 2, as qualified by the trial judge, shows that immediately

before the argument, he was requested by appellant's counsel to warn the crowd present against any demonstration; that this was done; that in making the request no mention was made of the relatives of the deceased. During the argument of one of the State's counsel, the widow of the deceased began weeping so that she might be heard over the courtroom; that the court directed the sheriff to admonish her that she must desist and that she must restrain herself or retire; that she did desist from audible weeping with the exception of an occasional sob until recess time. At noon, the court called upon the relatives to prevent her from entering the courtroom if she could not control her feelings. This was done, and the widow made no further demonstration. As a general rule, matters of this kind are not regarded as a ground for a new trial unless it appears probable that through them the jury was prejudiced against the accused. In this case the demonstration was promptly suppressed by the trial court, and considered in the light of the evidence, the court did not, in our judgment, abuse his discretion in refusing to grant a new trial. For similar instances, See Corpus Juris, Vol. 16, p. 1176, Sec. 2700. In the notes under this section will be found illustrations in our own and other jurisdictions.

An exception attacks the charge on the issue of insanity on the ground that it is not affirmative and submits that issue alone in the negative form. The charge given follows accurately that recommended by Judge WILLSON in his work on Texas Crim. Forms, 4th Ed., p. 519. This form has been approved by this court in many decisions which are there cited. We regard the complaint of it as not meritorious.

The body of the deceased was found some days after he had been missed, and among other facts describing the surroundings, there was testimony that there were some red ants around his head. There was also testimony that "there was a hole in the ground, four or five inches deep, where his feet went, and where the left-hand fell, there was gravel all raked up along the arm." This testimony was restricted by the court in both a verbal and written charge to the question of the length of time intervening between the death of the deceased and the time he was found. From the appellant's confession, it appears that he and his companions, after striking the deceased, put him in the locality in which his body was found. It was therefore competent for the State to corroborate the confession by relevant evidence. Kugadt v. State, 38 Texas Crim. Rep., 690; Branch's Ann. Penal Code, Sec. 1049; Corpus Juris, Vol. 16, Sec. 1514; Wharton's Crim. Ev., Vol. 1, Sec. 325; Vol. 2, Sec. 633. The complete description of the deceased, the locality in which he was found, the condition of his clothes, the condition of the ground where he was lying; in fact, all circumstances tending to show the cause of his death, the time of his death and the place of his death were rele-

vant. The evidence in question, we think, was embraced within this rule. Upon appellant's objection to its receipt, the court stated that it would be limited to the issue of corroboration. The limitation is deemed unnecessary but not material error.

The bill of exceptions complaining of the action of the court in permitting the jury to take with them in their retirement the written confession made by the appellant and introduced in evidence, we think, is without merit. Article 751 of the Code of Crim. Proc., in terms, authorizes the jury to take with them in their retirement "any papers used in evidence." The statute has been construed upon a number of occasions. See White's Ann. P. C., Sec. 873; Vernon's Tex. Crim. Stat., Vol. 2, p. 566. In Holder v. State, 81 Texas Crim. Rep., 195, based upon precedents there cited, the statute was construed to embrace the written confession of the accused. We are aware of no precedent to the contrary. None has been cited nor has there been any reason advanced showing the ruling as unsound. We feel constrained to adhere to it.

One of the private prosecutors stated in his argument that the father of the appellant had plenty of money with which to hire high-priced lawyers to defend him. This argument was objected to and a request made to instruct the jury to disregard it. The failure of the court to respond to this request is made the basis of complaint. We are referred to the case of Sorrel v. State, 74 Texas Crim. Rep., 100, in support of this view. However, we do not regard the case as authority for the proposition that the argument mentioned requires a reversal of the judgment. In Sorrells case, the appellant's counsel told the jury that they should not consider against the accused the fact that his father was rich. The State's counsel then replied with an inflammatory appeal to the jury, in substance, that the wealth of the appellant's father enabled him to surround himself with influential friends, and that "it has been said that *money could beat any case and that the jury should repel such accusation.*" This argument was condemned in the opinion. There were many other reasons given for a reversal of the judgment, however. The statement embraced in the argument in the present case is one that, in our judgment, should not have been made. It was not within the scope of legitimate argument; neither was it of a character so material as, under the circumstances of the case, is to be calculated to injuriously affect the result. To cause a reversal, the argument must not only be improper but of a material character, and calculated, under the circumstances of that particular case, to injure the accused on trial. See Willson's Crim. Proc., Sec. 2321; Hardy v. State, 31 Texas Crim. Rep., 292; Vernon's Tex. Crim. Stat., Vol. 2, p. 415; Corpus Juris, Vol. 16, p. 909, Sec. 2258; Moore v. State, 53 Texas Crim. Rep., 561; Howard v. State, 53 Texas Crim. Rep., 385.

In his motion for new trial, the appellant charged that the jury,

in its retirement, had received new, material and prejudicial evidence against him and charged various acts of alleged misconduct. Immediately after retirement, the twelve jurymen expressed the conclusion that the appellant was guilty of murder. Ten of them declared themselves in favor of the death penalty. The two jurors who did not at that time do so were Hutcheson and Young.

On the trial there was an issue of insanity. On the hearing of the motion, there was evidence that the juror Smith said that he knew the appellant; that he knew right from wrong, and that he was "as mean as the devil." Smith, on the hearing of the motion, testified and denied making this statement.

There was testimony that the foreman, Owens, in the course of the argument in the jury-room, stated that if the jury failed to give the death penalty, a mob would hang the appellant; also that Owens said that the offense was committed by three of them and that unless this, the first one, was given the death penalty, none of them would receive it; that Owens also said that if a mistake was made, the Governor would correct it; and he further stated that his own son was defective but that he knew right from wrong; that he (Owens) understood this kind of people. It was also argued that the jury should agree on a verdict in order to avoid the expense of another trial. Owens, in substance, gave the following testimony: That he was foreman of the jury. When asked if he had made any reference to a mob, said that it would be difficult for him to relate all that took place while the jury was discussing the case; that it was possible that something was said to the effect that "if the courts would uphold the law, there would not be any excuse for Ku Klux or any other mobs;" that he thought the word "mob" was used in that connection; that he thought he remembered remarking that if the jury made an error in their verdict that it would be or could be corrected by the Governor or the Court of Criminal Appeals; that no reference was made to his son. He said that he did not think that he used any language to the effect that if the appellant, being the first one tried, was not hung, that they would not hang any of the three defendants. He said that he could not say positively but that he did not recollect the use of any such words, either by himself of anyone else. He said further that there was no remark to his knowledge concerning the cost of the trial; that he recalled hearing nothing of the kind and made no such statement himself. Giving effect to the decision of the trial judge on the controverted issues developed on the hearing of the motion, it must be assumed that he found that Smith did not make the statement imputed to him touching the appellant's knowledge of right and wrong or to his being "as mean as the devil;" that Owens did not state that if the jury failed to give the death penalty a mob would get the appellant, but that his reference to the mob consisted of his statement that if the courts would uphold the law; the action of Ku Klux and

other mobs would be without excuse. That no remarks touching the expense of trial were made; that the remarks attributed to Owens to the effect that the first tried of the three offenders should be given the death penalty, otherwise the others would not be so treated, was not made by him in the terms testified to by the juror Young for the reason that Owens gave a qualified denial of it, and the credibility of Young was challenged by affidavits of contradictory statements.

The truth of the averments in the motion for new trial was a question of fact within the purview of the trial judge. We understand the rule controlling such matters to be that when the evidence is conflicting or the credibility of the witnesses impeached, that the decision of the trial judge must prevail. In other words, it is within the judicial discretion to overrule a motion for new trial based on the claim of misconduct of the jury and the action of the trial court will not be overturned on appeal unless it be shown to be clearly wrong. Douglas v. State, 58 Texas Crim. Rep., 127; Vernon's Texas Crim. Stat., Vol. 2, p. 792; Watson v. State, 82 Texas Crim. Rep., 305; Alexander v. State, 84 Texas Crim. Rep., 185; Reese v. State, 87 Texas Crim. Rep., 245; Barnard v. State, 87 Texas Crim. Rep., 365. Eliminating the averments upon which the evidence is conflicting, the remarks made during the deliberations of the jury we conceive to have been by way of argument. They cannot be justly classified as new evidence within the scope of subdivision 7 of Art. 837, but if related to that article at all, they are to be considered in connection with subdivision 8, which authorizes a new trial for *misconduct* of the jury, which *in the opinion of the court prevented* a fair and impartial trial. That the conduct of the jury proved did not, in the opinion of the judge trying the case, militate against a fair and impartial trial is made manifest by his act in overruling the motion. The inquiry arises, Did he abuse the discretion which the law vested in him? Was he "clearly wrong?" From Thompson on Trials, Vol. 2, Sec. 2618, we take the following:

"Upon the grounds of public policy, courts have almost universally agreed upon the rule that no affidavit, deposition, or other sworn statement of a juror will be received to impeach the verdict, to explain it, or to show on what grounds it was rendered, or to show a mistake in it; or that they misunderstand the charge of the court; or that they otherwise mistook the law, or the result of their finding. . . . But in these and other like cases the courts have steadily refused to listen to such affidavits. Neither is it admissible to show by the oath of a juror that he *did not agree to the verdict* as rendered; or that he consented to the return of the verdict without concurring in it, in order to secure his discharge, or because his health absolutely required him to be released from confinement; or that the verdict which was rendered *was not, in fact, the verdict* of the particular jurors. It will not be admissible thus to show that the verdict was *by mistake* returned as the verdict of the whole jury, when some of them were, in fact, in favor of finding it for the other party."

In support of appellant's contention that the reference to the mob during the deliberations of the jury was such misconduct as demands a reversal, we are referred to the case of Lax v. State, 46 Texas Crim. Rep., 628. In that case, the averment in the motion for new trial was that a juror named McKinney had, after the verdict, declared that the foreman of the jury, during its deliberations, stated: "Gentleman, we must give this man the death penalty, or he will be hanged before morning." The appellant obtained process for the juror but the officer refused to execute it, though he had ample time to do so. That case was reversed because the court refused or failed to have the juror McKinney brought into court so that the matter might be investigated. There can be no dissent from the conclusion stated that a verdict coerced by the fear of a mob is not untrammeled and unbiased. If we properly comprehend the Lax case, there was before the court an averment which indicated that the foreman of the jury had told the other members of the jury in direct terms that the death penalty must be assessed or the mob would hang the accused before morning. The record in that case does not reveal the reasons which impelled the foreman to make this statement, that is, whether the trial was had under the influence of a mob. The appellant Lax, through his attorneys, made all efforts that diligence could demand to have the juror to whom this statement was imputed brought before the court to the end that the matter might be investigated. Notwithstanding his efforts to that end, the court declined to force the attendance of the juror. This court reversed the judgment because the court did not facilitate an investigation of the truth of the averment. In the case before us,, the truth of the averment was investigated and it was shown that there was no fear of a mob and no declaration of the foreman to that effect, but that he used the argument that "if the courts performed their duty, there could be no excuse for any kind of a mob." It occurs to us that the evidence on the hearing of the instant case reveals a state of facts materially divergent from those passed upon in the Lax case, *supra,* but on the contrary, the declaration imputed to the foreman of the jury under the findings of the trial court does not suggest that the verdict was coerced by the fear of a mob nor that it was responsive to public opinion. Fairly interpreted, we think the record reveals that the jury in the instant case. after hearing the evidence and receiving the charge of the court, concluded immediately upon their retirement that the appellant was guilty of murder. Eleven of them favored the death penalty. The juror Young demurred. The matter of penalty was a legitimate subject of discussion. The question was, What is the duty of the jury in its capacity as a part of the court of the country? It was the opinion of the foreman that obedience to duty required the death penalty. In enforcing this view, he used the argument that if the courts performed their duty the excuse upon which the mobs attempted to justify

their acts could not exist. This put no new fact before the jury; it transgressed no statute.

By virtue of our statute on motions for new trial, Article 837, subdivisions 7 and 8, Code of Crim. Proc., and its interpretation by decisions of this court, the scope of the rule of public policy announced in the text is very much restricted in its application in this State. This is illustrated by many cases. See Mizell v. State, 81 Texas Crim. Rep., 241; Weaver v. State, 85 Texas Crim. Rep., 111; McDougal v. State, 81 Texas Crim. Rep., 183; Gilbert v. State, 85 Texas Crim. Rep., 597. Notwithstanding its modification, the rule has not been abrogated entirely, and when it does not run counter to the statute of this State, as interpreted by the decisions of its courts, it still operates. Cyc. of Law & Proc., Vol. 12, p. 678, subdivision (f), notes 17 and 18; Watson v. State, 82 Texas Crim. Rep., 305; Turner v. State, 61 Texas Crim. Rep., 97; Bacon v. State, 61 Texas Crim. Rep., 206; Montgomery v. State, 13 Texas Crim. App., 74; Wright v. State, 84 Texas Crim. Rep., 252; Bridges v. State, 88 Texas Crim. Rep., 61; Gonzales v. State, 88 Texas Crim. Rep., 248, 226 S. W. Rep., 405; Weatherford v. State, 31 Texas Crim. Rep., 536; Pilot v. State, 38 Texas Crim. Rep., 515; Corpus Juris, Vol. 16, Sec. 2682.

In Bearden v. State, 47 Texas Crim. Rep., 271, a juror testified that the jury stood seven for conviction and five for acquittal; that he proposed that if the jury would agree to a manslaughter verdict of two years in the penitentiary and also to sign a petition for pardon, he would agree to join them; that he did join them upon this consideration. Another juror made affidavit to the truth of these averments. The court expressed itself thus:

"Under the laws of this State, when the jury is impaneled, they are sworn to try the case according to the law and the evidence. Now, in this case we have two jurors, who were evidently sworn, making affidavit that they did not try the case, according to the law and the evidence adduced. The bare statement of this, shows the outrageous conduct of the jury. Here we have one oath against another oath; one, in which he swears he will try the case according to the law and the evidence, and another in which he publicly confesses by affidavit that he did not do so. If this were a question of fact upon which we could pass, we would be at a loss to know which oath to accept. But, under the decisions of this court, and all courts, such reprehensible conduct is not permitted to be used to set aside and destroy the solemn verdict of the jury."

In Montgomery's case, 13 Texas Crim. App., 75, one juror made affidavit that he was intimidated in consenting to the verdict by a charge being brought against him by another juror; that he was put upon the jury for the purpose of hanging the appellant. Two other affidavits were made by jurors to the effect that they agreed to the verdict upon the understanding that the other members of the jury

93 T. C.—36

would join them in the pettition for pardon.  Presiding Judge WHITE, of this court, disposed of the matter thus:

"As to the first affidavit, we do not believe a juror should be allowed to impeach his verdict in such manner, and to sanction such practice of impeachment would be both improper and dangerous. (Mercer v. The State, 17 Ga., 175.)

"As to the second affidavit, the case of The State v. Walman is directly in point, and therein it was held: 'That evidence will not be admitted to show that one of the jurors in a murder case only agreed to the verdict on condition that a petition signed by every member of the jury should be addressed to the Governor, asking that the penalty be commuted from death to imprisonment for life.'  (31 La. Ann., 146.)

"We are of opinion that the court did not err in overruling the motion for new trial, based upon the supposed misconduct of the jury."

It may be conceded that if some of the language imputed to the juror Owens was, in fact, used by him, his status as an unprejudiced juror would become a serious question.  Weaver v. State, 85 Texas Crim. Rep., 111; Lax v. State, 46 Texas Crim. Rep., 628.  As observed before, the utterance of the objectionable language was controverted the testimony of Owens.  Young, whose testimony was in the main relied upon to discredit the fairness of Owens as a juror, was attacked by affidavits found attached to the motion for new trial. In these it is claimed, among other things, that Young stated immediately after the trial that it was he who delayed the rendition of the verdict; that in doing so he was not impelled by any doubt as to its correctness; that but for him the other jurors would have rendered the verdict with undue haste.  The making of this statement was controverted by the affidavit of Young.

The juror Owens, when examined upon his *voir dire,* admitted his acquaintance with the father of appellant, and that he knew the appellant by reputation; that he was aware that appellant had made a confession; that he thought that no opinion formed by him touching the guilt or innocence of the accused would influence his verdict.  With this information, he was selected, without objection, by both the State and the appellant.  After he was sworn as a juror, State's counsel learned that Owens had written a letter of sympathy to the father and mother of the appellant.  On his information he informed the court and endeavored to get the consent of appellant's counsel to the dismissal of Owens from the jury.  Counsel for appellant declined to do so, stating that anyone knowing the father and mother of appellant would entertain feelings of sympathy towards them.

The averment charging the disqualification of the juror Owens, being controverted, is governed by the same presumption indulged in favor of the correctness of the ruling of the trial court as obtains with reference to other phases of misconduct of the jury involving issues of fact.

We are constrained to the conclusion that the conduct of the jurors in the instant case, which was not controverted, is not of a nature to warrant a reversal of the judgment.   The rule of public policy to which we have adverted is sufficiently vital in this State to preclude a reversal of a judgment of conviction on account of arguments used by one juror to another which, as in the present instance, are not in the nature of new evidence and do not relate to matters which, by statute, the jury is forbidden to discuss and which do not show prejudice of the juror against the accused or his case.

There was introduced corroborative evidence of the appellant's confession in practically all of its details.   He relied upon the defense of insanity and introduced upon that issue a number of witnesses, many of whom had known him during his entire lifetime; and they gave testimony supporting this defense.   At least, they related instances in his life, most of which were of trivial nature; upon them they based the opinion that his mind was weak; that he was easily influenced; and some of them said that his mind was unsound to the degree that he was not able to distinguish right from the wrong. Among the witnesses were two physicians.   One of them had known the appellant, who was between eighteen and nineteen years of age, during his whole life, though the witness had had but little opportunity to see appellant during the last three years.   He said that the appellant was like a child.   The other physician, who was also well acquainted with him, said that he had never regarded the appellant as possessing a normal mind; that he was of low mentality, easily influenced and had but little will power; that he was not an idiot but was childlike; that he would not be able to give an opinion as to whether the appellant's mind was such as to enable him to know the consequences of his acts for the reason that he (the witness) was in doubt about it.   The father and mother of the appellant, as well as his brother and uncle, testified upon the subject under discussion.

The State also introduced a number of witnesses who were well acquainted with the appellant and who expressed the opinion that his mind was sound and that he was able to distinguish right from wrong with reference to particular acts.   Some of these witnesses had known him intimately; others for a shorter period of time.   One of them was a teacher who had taught appellant in school during the years 1914 and 1915.   She said that she had observed his mental condition as a pupil; that she noticed nothing indicating that he was other than normal; that she did not remember the grades that he made at school but recalled nothing to distinguish him from other children; that in her opinion, based upon her knowledge of him, he was able to distinguish right from wrong.

One ground for the motion for new trial was newly discovered evidence.   The homicide took place on August 31st.   Appellant's confession bears date September 8th.   He was indicted October 8th, and

the trial began November 7th. The new evidence is embraced in several affidavits. That of Pera Todd, wife of the appellant, was to the effect that the marriage took place in December, 1920; that she and her husband resided part of the time in Fort Worth, and part of the time at the home of the appellant's father in Parker County. At the time of the homicide, they resided in Fort Worth, and the appellant was at his home both before and after the homicide.

Relating some demeanor and actions of the appellant, his wife would have given testimony that he was insane; that she did not reveal this to either the appellant or his attorneys but refrained from doing so because she did not want to be mixed up in the trial. It was shown by the County attorney that he had talked to Mrs. Todd (appellant's wife) before the trial took place; that she told him that her husband was in his right mind so far as she knew; that she had consulted the district attorney in Tarrant County and told him that she intended to get a divorce from her husband. McCall, the county attorney of Parker County, told her that if she obtained a divorce, she could testify in behalf of the State, otherwise she could not. She said that she did not want to testify either for or against her husband, but that she was going away. She did go to another county in the State.

The affidavit of Edwards was to the effect that he lived two miles from Weatherford, where the case was tried; that his farm adjoined that of the father of the appellant; that he had known the appellant for some two or three years, had seen him frequently, had ridden to town with him, had gone hunting and fishing with him, and talked to him on various topics, and had observed his appearance; that his mind was like that of a child, and, in the opinion of the witness, he was not capable of distinguishing between right and wrong.

Johnson, another witness, had resided in Weatherford all of his life; had known the appellant for the past three years; had seen him frequently during that time and had talked to him; had lived near neighbor to him; that he noticed that he was peculiar; that he was melancholy and seemed to take no interest in things; that his conversations were not coherent. In the opinion of the witness, the appellant's mind was unsound.

Heath, another witness, had worked at the home of appellant's father in July, 1921, and had noticed that the appellant was peculiar and different from other persons, and acted like a child. In the opinion of the witness, the mind of the appellant was not sound.

It is to be observed that one of the new witnesses was the wife of the appellant; the others were his neighbors. His father was a resident of the county; he was present at the trial and interested in behalf of the appellant. Appellant's attorneys were also residents of the county. The appellant and his wife were living together at the time of the homicide. He was with her on the day that the homicide was committed; both before and after. The record reveals that no conver-

sation was had with her; nor was any inquiry made touching her testimony. She could not have been used as a witness against him; and in the absence of more efforts having been made to obtain her testimony in his behalf, we think the rule of diligence has not been met. The same is true with reference to the neighbors Edwards, Johnson and Heath. Edwards lived on the adjoining farm to appellant's father. Johnson was a close neighbor to the appellant, and Heath was likewise a neighbor, and had worked for appellant's father while appellant was present. All of them were citizens, apparently known to both appellant and his counsel, as well as the relatives of the accused. Granting that in a case where the defense is insanity, the rule of diligence is somewhat lax (Walker v. State, 86 Texas Crim. Rep., 441), we think, in the instant case, the court did no violence of the law in holding the diligence insufficient to meet the requirements of the statute relating to newly discovered evidence. Article 837, subdivision 6, Code of Crim. Proc.; Vernon's Texas Crim. Stat., Vol. 2, pp. 777 and 778; Toussaint v. State, 92 Texas Crim. Rep., 374, 244 S. W. Rep., 513. Moreover, the alleged newly discovered evidence was not such as to warrant a disturbance of the judgment. There was no outstanding fact in any of the new testimony upon which the opinion of insanity was predicated. All of the newly discovered evidence related to conduct of the appellant which was in no material sense dissimilar from that which was described by the numerous witnesses who testified in his behalf on that issue upon the trial.

The order of the court overruling the motion implies the decision that he did not regard the testimony such as would probably produce a different result. In the light of the facts, this court is not in a position to say that the record warrants this court in holding that the trial court abused its discretion.

From the confession of the appellant, corroborated in many of its details, it was shown that appellant and Dawson, some three days before the homicide took place, formed a plan to get into an automobile with some person and rob him; that a suitable weapon—an iron rod or pipe—was provided; that on one or two occasions they did get into a car for the purpose of carrying out this intent but failed to do so; that they were subsequently joined by a third party, who was also provided with an iron rod suitable to be used as a bludgeon, and that while riding in the car of the deceased, they assaulted, wounded and took him out of the car and placed him in a dry creek in a pasture; that they previously selected the place and agreed upon a plan which was carried into effect; that the blood from the deceased was spilled on the car, and upon the clothing of the deceased; that unsuccessful efforts were made to remove the blood-stains; that the car belonging to the deceased was taken to Fort Worth and from thence to a point some distance therefrom, where it was left in a ditch; that in taking the car to this place, they hired another automobile, which they

returned, depositing part of the money which they obtained from the deceased to guarantee the return of the car; that part of the money was used in buying clothes for Dawson, one of appellant's companions; that the bloody apparel of the deceased was hidden and Dawson's clothes worn at the time of the homicide were thrown away; that the money was divided among them; that appellant, instead of returning to his home or to that of his father, went from Fort Worth to Hillsboro and from thence to Waco, Belton, Temple and other places.

In solving the issues, the jury had before them the evidence of the part that appellant took in planning, executing and concealing the crime, and his flight.

The deceased resided in another county. The appellant was tried in that in which he was reared and in which his relatives resided. He was represented by the most skillful counsel, and the record at every point bears evidence of the fidelity with which they performed their duty.

The youth of the appellant is appealing. It was doubtless urged and considered by the jury. They, at a trial conducted by an able and impartial judge, have rendered a verdict assessing the extreme penalty.

We find nothing in the rulings of the court, the conduct of the jury, or the evidence which would warrant this court in overturning the verdict and reversing the judgment of the trial court approving it.

The judgment is affirmed.

*Affirmed.*

ON REHEARING.

February 28, 1923.

LATTIMORE, JUDGE.—In a logical and forcible motion for rehearing appellant insists that we erred in our original opinion. The only grounds of the motion that we deem it necessary to discuss are those calling in question our opinion wherein is upheld the action of the trial court in refusing a motion for new trial based on misconduct of the jury. The matter of misconduct being controverted, we are not inclined to question the correctness of our holding to the effect that the evidence being before the court below at the time the motion for new trial was presented, and having been heard by him and decided adversely to appellant, we are bound by such action unless it plainly appears to us that there was no evidence to justify the conclusion reached by the learned trial judge. The complaint was based principally upon two statements alleged to have been made by members of the trial jury while in their retirement. One was that a juryman said in substance if the jury did not assess the death penalty a mob would get the defendant. The other set up that it was stated in said jury room in substance that there were three persons involved in this killing, and that

this was the first one to be tried, and that unless the death penalty was assessed in this case, it would not be assessed in the others when tried. We have been unable to bring ourselves to believe either of these matters to be statements of facts purporting to be known to the declarants and of the existence of which the other members of the jury were not aware and whose statements so made would be in the nature of other evidence presented to the jury while deliberating. Nor are we willing to agree that such statements even if made, evidence such misconduct on the part of the trial jury as would require a reversal at our hands. From the case of Jack v. State, 20 Texas Crim. App., 660, we take the following quotation:

"But we are not prepared to say that the statement of the juror, complained of, constituted misconduct such as the law contemplates as a ground for new trial, even if it did have the effect to increase the defendant's punishment. The statement had no reference whatever to the question of defendant's guilt, and could in no way have affected the determination of that issue. It was a statement made by way of argument, explaining the juror's reasons for being in favor of assessing a greater punishment than in ordinary cases of theft. He had himself suffered loss by theft committed by his porter, and he thought that this class of employees should be dealt with severly when they stole the property of their employers, because they were trusted, and could not be watched and detected as others could be in whom no such confidence was reposed. We have found no decision in this or any other State which goes to the extent of holding such statements to be misconduct. It seems to us that it would be a dangerous and exceedingly pernicious practice for the courts to permit the sanctity of the jury room to be invaded, and jurors to be interrogated as to the arguments used in their deliberations, and the influence of such arguments upon their minds, and the reasons and considerations upon which their verdicts were based. There might arise, perhaps, an extreme case in which such a practice would be tolerated to prevent flagrant wrong and injustice, but this court would not be willing to sanction the procedure unless it should manifestly appear that the ends of justice imperatively demanded it. If it were permitted to attack and set aside a verdict because of arguments and reasons advanced and urged by jurors in their deliberations thereon, it would destroy free discussion and interchange of opinions among jurors. It would open the door to a searching inquiry in relation to every act and word which transpired in the jury room, and would subject each individual juror to be placed upon trial before the court to answer for the soundness and propriety of the opinions expressed by him in the jury room.

"There is no warrant in the law for such practice."

This opinion of Judge Willson so fully expresses our views in regard to the matter embraced in the complaint under discussion that

we do not deem it necessary to add anything thereto. We merely state that it was necessarily manifest to all of the other jurors that if one of their number said: "If we don't hang this man, a mob will get him;" and that if one of their number said, "If we° don't hang this man, the other two will not be hung when they are tried,"—that these were but purely speculative and conjectural opinions and expressions, not of past facts but of future probabilities, that each member of the jury knew and could not have failed to know that such utterances were merely argumentative.

We regret we cannot attach the importance to the testimony given by a State witness that there were ants found upon the head of deceased after his death as to think this character of evidence so prejudicial as to call for a reversal of this case.

The other questions raised by appellant in his motion for rehearing apparently have been thoroughly considered and discussed in our original opinion and we see no good that can come of any restatement of them or of our views.

Finding no error in the motion for rehearing, same will be overruled.

*Overruled.*