### ATHEL GALLOWAY v. THE STATE.

No. 7659.   Decided May 23, 1923.

Rehearing Denied June 20, 1923.

**1.—Murder—Sufficiency of the Evidence—Insanity.**

Where, upon trial of murder, it is contended upon appeal that the verdict of guilty on the issue of insanity is against the great preponderance of the evidence, this court must hold from the record upon appeal that the evidence sustains the conviction under a proper charge of the court. Following Apolinar v. State, 92 Texas Crim. Rep., 583 and other cases.

**2.—Same—Argument of Counsel.**

Where, upon trial of murder, the defendant objected to the argument of the counsel for the State, which objection was sustained by the court, and the jury directed to disregard the same, the same was sufficient under the facts of the instant case. Following Todd v. State, 248 S. W. Rep., 695.

**3.—Same—Rehearing—Insanity—Motive.**

Where appellant in his motion for rehearing insisted that the entire absence of motive, coupled with the surrounding circumstances, overturned and rebutted any evidence of the killing in that condition of mind which would make the slayer be responsible, *held* that this court cannot agree with such contention.

**4.—Same—Argument of Counsel.**

Argument of State's counsel is not such which is deemed by this court sufficient to call for the reversal of the judgment below under the record of appeal in the instant case.

Appeal from the District Court of Stonewall. Tried below before the Honorable W. R. Chapman.

Appeal from a conviction of murder; penalty, eleven years imprisonment in the penitentiary.

The opinion states the case.

*Murchison & Davis,* for appellant.

*R. G. Storey,* Assistant Attorney General, for the State, Cited cases in opinion.

HAWKINS, JUDGE.—Conviction is for murder, the assessed punishment being eleven years confinement in the penitentiary.

The killing occurred on February 21, 1922. The deceased, Willie Welty, was a boy seventeen years of age. About two years before the homicide the father of deceased had rented land from appellant and some friction had occurred between them which resulted in appellant buying out the crop. Some little difference between him and the Weltys relative to the settlement came about, but nothing of a serious character. Immediately preceding the killing a drought had existed in that part of the state and a number of people had been hauling water from appellant's tank. It was getting low. In November, 1921, appellant had posted a notice on the gate leading to the tank to the effect that no more "stockwater" could be hauled therefrom, but that "drinking water" might still be taken from the tank. On February 17th, 1922, four days before the killing, he had changed the notice and put one up prohibiting the further hauling of water for any purpose. On Sunday before the killing, which occurred on Tuesday, appellant had notified some neighbors in writing and some verbally that they would not be permitted to take any further water from the tank; as testified to by some of them, he ap-

peared to be rather out of humor and angry and seemed to think he had been imposed upon with reference to the water. Two of the neighbors on Sunday went to his place in wagons for the purpose of getting water, but seeing the notice, went to his house and talked to him. He declined to let one of them get any water at all; the other he gave two buckets of water from his cistern and gave him permission to come back the next day and get some from the tank, but told him he could not get it on Sunday. Among other neighbors who had been hauling water from appellant's premises were the Weltys. On the day of the homicide deceased with some barrels in the wagon drove down to the tank for the purpose of getting water. He came through the gate upon which the sign was posted prohibiting further water hauling. Appellant had been working in his garden near the house and, while the record does not so state the inference may be reasonably drawn therefrom that he saw deceased go through the gate and to the tank. There was only one eyewitness to the killing. G. F. Smith, a tenant on appellant's place, went to the tank at noon for the purpose of watering his team. As he approached he saw appellant and deceased apparently engaged in conversation, but the wind was blowing from his direction toward them and he heard nothing that was said. A wire fence ran through about the middle of the tank and deceased was on one side of this fence with his wagon and team and appellant on the other. The witness noticed deceased on the ground with a water bucket in his hand, and heard an exclamation from one or the other of them louder than the previous conversation, and this called his attention to them. He saw appellant draw his pistol and fire seven shots into the body of deceased. Deceased was facing appellant at the time the shooting commenced, but turned from him and went around the wagon. Some wounds were in his side and some in his back, only one entering from the front. The witness spoke to appellant and told him that he "ought not to do that," or asked him "not to do that," and appellant replied, "I have done enough." He then put his pistol up, took a bible from his pocket and told witness to read the 16th Chapter of Matthew. Witness told him that the law would take hold of the matter and that he (witness) wanted to do what the law required and was going to tell the truth about it. Witness told appellant he was going to stay there with the body and wanted somebody else, and appellant asked witness whom he wanted and witness sent him after his brother, Lige Smith. The latter was not at home and appellant returned to the tank and so reported; he was then sent to witness' home. Appellant made this second trip and again reported at the tank and from there went back to his house. He declined to tell Mrs. Lige Smith what the trouble was at the tank, but said an accident had occurred and that Lige's brother wanted him to come to the tank as soon as he came back to the house.

Appellant interposed insanity as a defense. We do not go into the testimony upon this issue in detail, but the substance of it may be stated in a few words. Members of his family testified that when he was about fifteen years old he had an attack of some kind which lasted for several days in which he appeared to be hysterical; that he laughed and cried and appeared to be afraid of some imaginary evil. At this time he was examined by a physician who also testified that at the time he thought his mind was affected and that he was then insane. Members of the family also testified that he subsequently had other spells of a similar character which would sometimes last for only a day and at other times for several days. Appellant had married and some of these attacks had occurred subsequent to the marriage, and were testified to by his wife as well as by other members of his family. The record shows that he had attended to his business affairs, had accumulated some property and many of his neighbors who had known him for a number of years testified that they had never observed anything in his conduct which would indicate that he was abnormal or that led them to believe he was insane. The testimony of his wife was to the effect that he seemed to be very much worried over the water hauling from his tank, and would read the Bible and justify himself in stopping the neighbors from getting further water on the ground that it was his duty to provide for his family and that one who did not do so was worse than an infidel; that he had not slept for three nights previous to the homicide, and that when he came to the house after the killing he got a hymn book and sang several hymns, and declined to eat dinner until after he had finished singing.

The argument is presented that the verdict of the jury on the issue of insanity is against the great preponderance of the evidence. We have not undertaken to set out all the incidents proven upon which appellant relied to establish insanity. An issue was made as to that matter, and a charge so full and fair was given that no objection whatever is made to it in that or any other particular. If the jury had found with appellant on the insanity issue its action would have had support in the evidence; likewise its finding in favor of the state is not subject to the criticism that it is without support. In Apolinar v. State, 92 Tex. Cr. Rep., 583, 244 S. W. Rep., 813, and Sagu v. State, 94 Tex. Crim. Rep., —, 248 S. W. Rep., 390, we had occasion to review facts much stronger in our judgment on the issue of insanity than those presented in the case now before us. In both of those cases there appeared to be an entire absence of adequate motive for the homicide, and while that might be considered by the jury, it was held not to be conclusive against the state upon the issue of insanity. While the disregard of a seventeen year old boy of a notice prohibiting the hauling of water would appear to present little motive for this killing, yet it is stronger than any suggested in the cases mentioned.

We find only five bills of exception in the record, all of which relate to argument either of the district attorney or those employed to assist him in the prosecution. We gather from the record that the case was vigorously prosecuted and equally as ably defended. It is rather unsual that no exceptions were taken to the admission of any evidence on the part of the state nor to the refusal of any offered by appellant. The absence of such exceptions is itself a tribute to the fairness of the learned judge who presided at the trial. The bills reserving exceptions to the argument contains only short excerpts thereof, giving neither what preceded or followed the few words objected to. The excerpts stated in the bills are as follows:

(A)  "This defendant has been in jail here seven months and his learned counsel have never had him tried and sent to the asylum."

(B)  "Are you going to turn a criminal loose to kill all the people in the country?"

(C)  "Are you going to find this defendant guilty of insanity and turn him out here to prey upon these people?"

(D)  "If you turn him loose with this pistol there are about ten thousand men is Stonewall county who had better move out."

(E)  "He (defendant) is the kind of a man who with malice aforethought goes out and slays the baby child."

In every instance where the arguments were objected to the court at the request of counsel instructed the jury that the remarks were not supported by the evidence, were improper and directed the jury not to consider them in arriving at their verdict. Appellant refers us to many cases wherein this court had held certain argument harmfully erroneous and reversible. The difficulty is that the cases rarely furnish a precedent helpful in determining the point in the case then being considered. Of necessity it must depend upon the facts of each particular case whether the language complained of is of such a character as would warrant a reversal, and for this reason no general rule applicable in all cases can be laid down. In Todd v. State, 93 Texas Crim. Rep., 553, 248 S. W. Rep., 695 it is stated that, "To cause a reversal, the argument must not only be improper, but of a material character, and calculated, under the circumstances of that particular case, to injure the accused on trial." (See authorities cited in Todd, supra). This court has generally held that prompt action of the trial judge in directing the jury to disregard improper argument would obviate a reversal except in extreme cases where the argument injected new facts of an obviously harmful nature, or where the language was so inflammatory in character that its harmful effect could not be remedied by withdrawal. (See Branch's Ann. P. C. Section 362, page 204.) Applying such principles to the arguments complained of, we are of opinion that under the facts of this particular case they were not of such a character as to demand a

reversal at our hands, where the court instructed the jury as he did in this instance.

Believing the record calls for an affirmance of the judgment it is so ordered.

*Affirmed.*

### ON REHEARING.

### June 20, 1923.

LATTIMORE, Judge.—Appellant earnestly insists that the entire absence of motive in this case coupled with the surrounding circumstances overturn and rebut any evidence of a killing in that condition of mind which would make the slayer legally responsible and that this court should reverse this case because the jury failed to find in accord with appellant's plea of insanity. The matter received mature consideration on the original presentation of this case, and aside from the weight to be attached to the proposition that a homicide upon slight motive would appear to suggest insanity, the evidence in favor of that theory might well be claimed to preponderate against appellant's position. Many people who had known appellant for many years prior to the homicide testified contrary to his claim of insanity.

We see no reason to change our views on the matter of the argument for the State. The protection of the lives and property of the members of organized society, is the chief justification for laws whose enforcement requires those violating them to suffer pains and penalties. Reference to matters of this kind in argument is not deemed by us sufficient to call for the reversal of cases.

The motion for rehearing will be overruled.

*Overruled.*