STEVE MITCHELL V. STATE.

No. 25014. February 14, 1951.
Rehearing Denied May 23, 1951.

Hon. Langston G. King, Judge Presiding.

*Percy Foreman,* Houston, for appellant.

*A. C. Winborn,* Criminal District Attorney, *E. T. Branch,* Assistant Criminal District Attorney, *Spurgeon E. Bell,* (Special Prosecutor) all of Houston, and *George P. Blackburn,* State's Attorney, Austin, for the state.

WOODLEY, Judge.

The appeal is from a conviction for the murder of Jean Mitchell, the wife of appellant, the jury having assessed the death penalty.

The deceased met her death as a result of a pistol bullet fired into the top of her head approximately five inches above the left eye and four inches above the left ear. Her body was found in the bathroom of the living quarters adjoining appellant's cafe.

Appellant and the deceased had been separated for a time, but the living quarters in which the killing occurred was their home.

Appellant testified that the pistol was discharged while held by the deceased in her left hand, and during a struggle in which he was attempting to prevent her from shooting him with the pistol. He undertook to demonstrate before the jury how, during the scuffle over the pistol, the deceased was shot in the top of her head while they were both standing on their feet in front of the commode, he being behind her with his arm around her. Also he testified that after the pistol was discharged it fell on the floor and he picked it up and threw it on the bed in the adjoining room; that he then left the bathroom at which time the deceased was still standing up; that he saw her hit the back wall and just sit down on the commode; that he then ran to the cafe to try to get help for his wife.

The court's charge to the jury submitted appellant's right to defend himself against the attack of his wife, and fully charged upon appellant's theory that the killing was the result of an accident.

Roy Caperton, a state witness, testified that he was the driver of the ambulance which called for the body of the deceased, and assisted in removing her body from the commode; that he examined the body prior to its removal and that the dress of deceased was raised above her buttocks as though she were in the act of using the commode; that he noticed that the water in the commode was discolored, and gave the appearance of having urine mixed with water. He further testified:

"I removed the body from the commode. In removing the body I had occasion to find out the condition of the woman's clothes when I moved her off of the commode. Her dress was pulled up just to about her hips, and her underclothes were down just barely above her knees. Her private parts and buttocks were exposed to the commode where she was sitting. Her underclothes, or her panties, were around her knees. * * * She was sitting there on that commode in that position with her

head leaning to the left against the wall with blood coming down the wall. She had on glasses."

He also testified:

"I noticed the wound on the woman's head. As far as I know there wasn't any powder burns around the wound, but there was on the wall just above her head."

Bill of Exceptions No. 13 complains of the action of the trial court "in refusing to permit proof as to witness Roy Caperton's character; illegal occupation; the fact that he was a panderer; the fact that he had given various hot checks, and that he had stolen merchandise in Corpus Christi."

The qualifications to this bill show that the trial court declined to certify that he had refused to permit proof as to the witness' character, illegal occupation, or the fact that he was a panderer.

The qualifications further certify that the witness, on cross-examination, admitted that he had been filed on for the offense of swindling by complaint in October, 1947.

The trial court was correct in his ruling that specific acts of misconduct not culminating in a prosecution were not available for impeachment purposes. See Ballew v. State, 97 Tex. Cr. R. 325, 260 S.W. 1045; Myers v. State, 149 Tex. Cr. R. 301, 194 S.W. 2d 91; Branch's Ann. P.C., p. 102, Sec. 168.

Bill of Exceptions No. 2 relates to the following testimony of Police Officer R. W. Hope, Jr.:

"That he arrived at the scene, together with his partner, uniformed police officer C. C. Outman, about 12:40 noon on December 16, 1948, and at a time when the defendant Steve Mitchell was talking over the telephone. That the defendant stated he had just killed his wife. That he had shot her. That said police officer walked around the bed in the front room and found a pistol lying on the bed and asked the defendant what did he shoot her with, this pistol, and the defendant said 'Yes,' and the witness then picked up the pistol, unloaded it and it had five shells and an empty hull and that the defendant then said to the police officer that the reason he shot the deceased was she had been running around with some truck driver and had sued him for a divorce and half of what he had and he just shot her and that the defendant then said to said witness that he had a

right to kill the deceased and then asked said witness and his partner, C. C. Outman, if they did not think that he had a right to kill the deceased * * *."

According to this bill, objection was made at the time and in advance of the offering of such testimony, the ground of objection being that the defendant was in custody, and the testimony being in the nature of a confession was inadmissible because the provisions of Art. 727, C.C.P., were not complied with; that to admit such testimony would require the defendant to give evidence against himself in violation of the Constitution, and the provisions of Art. 727a, C.C.P.

The trial court's qualifications to this bill reflect that the police officers mentioned had no information as to who, if anyone, had been shot or killed nor who did the shooting, until after witness Hope heard appellant while talking over the telephone say that he had just killed his wife; shot her. The testimony of the officers Hope and Outman was referred to and made a part of the court's qualifications to the bill.

Learned counsel for appellant argues with much force that such testimony was not admissible as a part of the res gestae; that the record shows that appellant was under arrest at the time, and that the confession was not admissible under that part of Art. 727, C.C.P., which reads: "* * * unless in connection with said confession, he makes statements of facts or circumstances that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed."

As we understand this bill, appellant sought and obtained the ruling of the court on the above quoted testimony in advance of its being offered, and the trial court heard the testimony to be offered and for the purpose of his ruling accepted as true counsel's statement of the testimony he proposed to offer in support of his objection.

Counsel for appellant renewed his objection to the whole of the testimony quoted at the time it was offered, and the trial court overruled the objections.

An objection directed to the whole is properly overruled when part of the testimony objected to is admissible, or where the court was authorized to exclude only a part. See Tubb v.

State, 55 Tex. Cr. R. 606, 623, 117 S.W. 858; 868; Solosky v. State, 90 Tex. Cr. R. 537, 236 S.W. 742.

We are inclined to the view that the statement testified to have been made by appellant was admissible as part of the res‧ gestae, and also by reason of the finding of the pistol which proved to be the weapon used in the killing and which the witness stated was the weapon so used.

The officer testified that he came to the scene in response to a report that a shooting had occurred, and with no further information in regard thereto. That upon his arrival he found appellant engaged in a telephone conversation with some unidentified person, and heard him say in such telephone conversation that he had just killed his wife.

The testimony of the officer regarding this statement was without doubt admissible. Appellant was certainly not then in custody.

Bill No. 5 relates to the introduction of a written statement of Mary Allen, an employee of appellant, who testified in his behalf. On direct examination, this witness testified in part as follows:

"My name is Mary Allen. I am a cook. I work at Steve's Drive-In Stand. It is known as Steve's No. 7 at the corner of Jensen and Collingsworth."

"On December 16, 1948, I went to work around a quarter to 7 in the morning. I was supposed to get off at 4 o'clock."

"When I saw Steve Mitchell in the kitchen he came in there and told me he was going to the market; * * *"

"At the time he told me that Mrs. Mitchell was not there."

"After telling me to take over, Mr. Mitchell left immediately and went to the living quarters. In my best judgment it was at 12:00 o'clock."

"After he went to the living quarters and I relieved him, Mrs. Jean Mitchell, his wife, came on the lot. It was just a few minutes after he left that she came on the lot."

"When she came in the rear door of the restaurant she said, 'Where is Steve at' and she cursed. She cursed Mr. Steve. Mr. Steve was not there at that time. Her exact words were, 'Why ain't that damn Greek at work.' She said, 'Why ain't that God

damn Greek at work.' He was not there working when she came in.

"Mrs. Mitchell then went through the dining room and went out the front door, and then she came back in. When she came back in she said, 'I am going to fix . . . .' and she cursed again. She slammed the door when she came in, the front door. She then went out the back door, and slammed that door as she went out.

"When she went out the back door and slammed it I watched her from the kitchen window at the back. As she went to the living quarters she was cursing loud, and she got to the door and was trying to get in, ringing the door of where she lived, the living quarters forty-five feet away. I could hear her still cursing; she just kept cursing. She kept saying, 'I am going to fix that God damn Greek.' When I say she was 'ringing the door, trying to get in,' I mean the door was shaking. I saw her shaking at the door knob of the living quarters. It was the front door.

"She finally got inside. She quit cursing a short time before she was admitted to the inside of the house. She then went in the house, and I went on about my work.

"I did not hear any shot.

"After I saw her go into the living quarters, it was about five or ten minutes before I saw the defendant, Steve Mitchell. When I saw him he was standing in the dining room. When he came into the dining room he said he was trying to take a gun from Mrs. Steve and the gun went off. He said she had been shot, and somebody said, 'Where?' and we rushed outside, that is, I rushed outside. I don't know if anybody else did. Mr. Steve went out and Miss Kathlene Riley went out.

"I noticed Mr. Mitchell's face when he came in the dining room. He was scratched on the face, and his shirt-tail was out, and there was blood on him, on his face. From the nature and shape of the scratches they were apparently made by finger-nails. His face was scratched on the side, right and left, and on his chin."

Over appellant's objection, the state offered the written statement of this witness made to Homicide Detective F. E. Melder on the afternoon of the shooting and reading as follows:

"My name is Mary Allen. I am 42 years old and live at 212 Short Polk. I am employed as a cook at Steve's Drive Inn #7,

located at 3501 Jensen Drive. I went to work this morning about 6:40 A.M. Mr. Steve Mitchell was there today when I got there. Sometimes he would open up and then again sometimes Mrs. Steve would open up. Mrs. Steve came to work around noon, and I was busy serving lunch so did not notice when she left. About twelve *forth* Mr. Steve walked into the place and said that he had killed his wife, and for us to close up. I did not know there was any trouble going on and did not hear any shots. I was shocked when he told me to close up that he had killed his wife.

"The above is all I know about the case. I can read and write and have read the above statement and it is *ture* and correct.

"(Signed) Mary Allen

"Witnesses: F. E. Melder
"J. J. O'Rourke."

The objection urged as shown by this bill was that the statement was hearsay and was "unsworn" testimony and "amounted to trying the defendant on unsworn hearsay testimony."

Bill No. 9 complains of the manner of cross-examination of the witness Mary Allen from such written statement, the objection being as follows:

"Mr. Foreman (defense counsel) : 'May it please the court, I have no objection to any impeachment, if there is anything in the statement contrary to what the witness said, but as to the district attorney taking the statement and reading it word for word, we object to it as hearsay and unsworn testimony, taken out of the presence and hearing of defendant, and ask that any examination be limited solely to whatever is contrary to what the girl said' ".

As shown in the foregoing excerpts from her testimony, it is apparent that this witness testified on the trial to a state of facts materially different from her former statement. The statement was therefore admissible for impeachment purposes insofar as it did not coincide with her testimony at the trial.

Appellant appears to have recognized such rule in his objection above quoted from Bill No. 9.

We see no harm to appellant in the fact that parts of the statement to the same effect as the testimony given by the witness were also permitted in evidence. The witness was called by appellant and he should not be heard to complain of any added

emphasis given the testimony in his behalf. If inadmissible, such evidence is not shown to have been harmful or prejudicial.

Bills Nos. 7 and 10 are similar to Bills Nos. 5 and 9, but relate to a like statement, examination and cross-examination of Kathlene Riley, an employee of appellant at the time of the killing and also a witness offered by him. What has been said regarding Bills of Exception Nos. 5 and 9 disposes of these bills.

Bills Nos. 6 and 8 complain that the trial court, over appellant's objection, permitted the written statements of the witnesses Mary Allen and Kathlene Riley respectively to be taken to the jury room along with the other exhibits.

Art. 674, C.C.P., provides that the jury may take with them any writing used as evidence.

Construing such article, this court has held that it was not error to permit the jury to take with them, upon their retirement, a written statement or confession signed by the accused and offered in evidence. See Holder v. State, 81 Tex. Cr. R. 945, 195, 194 S.W. 162; Todd v. State, 93 Tex. Cr. R. 553, 248 S.W. 695.

And in the more recent case of Garcia v. State, 151 Tex. Cr. R. 488, 207 S.W. 2d 877, we said in effect that a jury may take with them any writing or other exhibit used as evidence, though a refusal to allow the jury to have such exhibits while deliberating is not error unless the jury requests the exhibits.

We see no error in the trial court's action in complying with the jury's request and permitting the statements to be taken with the other exhibits to the jury room.

We overrule the contention that the trial court abused his discretion in limiting the argument to two hours to the side, and in refusing to extend such time.

Bill of Exceptions No. 12 complains that the trial court declined to permit testimony as to his good reputation for truth and veracity.

The bill points out that appellant had testified denying the testimony of the officers to the effect that he had confessed that he shot his wife "because she was running around with some

truck driver and had sued him for half of what he had and he just shot her and that he thought he had a right to kill her."

Appellant's testimony was merely a denial of the truth of the testimony of the officers, or a contradiction thereof. Such is not a sufficient predicate for the introduction of proof of general reputation for truth and veracity. See Gordon v. State, 152 Tex. Cr. R. 188, 212 S.W. 2d 185; Branch's P.C., p. 115, sec. 184.

Authorities cited deal with fact situations where the witness is sought to be impeached by proof of contradictory statements, and are therefore not applicable.

Bill of Exceptions No. 16 complains of the overruling of appellant's motion based upon the circulation, during the selection of the jury, of local newspapers carrying news stories claimed to be inflammatory and highly prejudicial which criticized the defense and counsel.

Appellant moved for such reason that he be permitted to withdraw his announcement of ready, that a mistrial be declared and the case continued.

Eight or nine jurors had been selected prior to the newspaper incident, and the qualifications to the bill certify that it was not affirmatively shown that any juror who had read the complained-of-articles served as a juror in the case.

The bill does not show that appellant exhausted his challenges, or that he was forced to accept any juror who was objectionable to him. Nor is it shown that appellant was prejudiced before the trial jury by the newspaper stories. We therefore overrule this bill.

The jury accepted the state's version of the killing and rejected appellant's defense. The physical facts and the testimony warranted the jury in finding appellant guilty of murder with malice, and in assessing the extreme penalty.

Finding no error requiring reversal, the judgment is affirmed.

Opinion approved by the court.

ON APPELLANT'S MOTION FOR REHEARING.

MORRISON, Judge.

After submission of appellant's motion for rehearing, we have again reviewed the entire record and will attempt to discuss the case in the order in which the same was presented to us at such time.

Bill of Exceptions No. 12 is leveled at the failure of the trial court to permit appellant to offer character witnesses' testimony as to his good reputation for truth and veracity.

The state, in making out its case, proved by two peace officers that upon their arrival at the scene of the homicide appellant made to them a statement as to his reason for having committed the same. When defendant took the stand, he denied having made such a statement to the officers and assigned another reason for having fired the fatal shot. Appellant claims this to be a sufficient predicate for the introduction of testimony supporting his reputation for truth and veracity and relies heavily upon Stillwell v. State, 104 Tex. Crim. Rep. 338, 283 S.W. 840. In that case the state had made out its case in chief; appellant had testified; had been cross-examined; and in rebuttal the state offered a confession containing statements inconsistent with appellant's testimony. Following this, appellant offered witnesses to support his reputation for truth and veracity. These, the trial court refused to hear. Judge Lattimore pointed out that by virtue of the order of the above procedure, the *state* having made the issue as to the contradictory statements of appellant, he was therefor impeached and the testimony as to his reputation for truth and veracity should have been heard. The court went further in that case and discussed White v. State, 42 Tex. Cr. R. 567, 62 S.W. 575, approving the holding therein.

In the White case the state introduced against the accused, as part of its case in chief, statements made by him with reference to the crime. He took the stand and swore to the contrary. He then sought to bolster his testimony by that of other witnesses. In differentiating between the Stillwell and White cases, the court said:

"The clear distinction is that in such case the state offers no contradictory statements to those made by appellant, but proves as original testimony his declarations and statements, and that he cannot thereafter put his character in evidence by testifying

in his behalf to facts contradictory to those offered by the state." (104 Tex. Crim. R. 338, 283 SW 843.)

To sustain appellant's contention would be to authorize every defendant to bolster his defense with witnesses as to his reputation for truth and veracity by the simple expedient of disagreeing with the state's version of the case. The defendant himself may not create the contradiction or impeachment and profit thereby.

Bill of Exceptions No. 11 complains that the trial court limited the time for oral argument to two hours to the side. This, appellent claims, was an abuse of his discretion. With this we cannot agree. Appellant's counsel was notified by the court before he began speaking that he would be limited to two hours. We feel that this is ample time and that appellant's counsel should have organized his discussion so as to present it within such time.

Bills of Exception, Nos. 5, 6, 7, 8, 9 and 10, complain of the cross-examination of certain witnesses concerning written statements which they had made to investigating officers shortly after the homicide, the introduction into evidence thereof and permitting the jury to take such statements with them into the jury room during the course of their deliberations.

It will be noted that appellant offered such witnesses, but he takes the position here that only such portions of their statements as conflicted with their testimony given on the trial were admissible. This, we think, is academic. We know of no rule that is violated and can conceive of no injury done appellant when the state, in attempting to impeach defendant's witness, in part corroborates them. We feel that the jury had a much better opportunity to test the credibility of the witnesses by hearing them testify and then reading complete statements made by them shortly after the commission of the offense. This is predicated, of course, upon the existence of a conflict between the two expressions of the witness. This we find to exist in the case at bar.

The only serious question presented is that reflected by Bills of Exception, Nos. 2, 3 and 4. These bills are leveled at the admission in evidence of two statements made by appellant to and in the presence of the arresting officers. Appellant, in his objections and in his bills, irrevocably links them together as one and must be bound thereby. The first statement was made

by appellant over the telephone just as the first officer came in the room to the effect that he had just killed his wife by shooting her. This was information unknown to the officer at that time. All the officer knew at the time he walked in the room was that a shooting had taken place at that address. Appellant's objection to this statement and the one that followed was that they constituted a confession of appellant and had not been reduced to writing as required by statute. The statement above set forth was admissible as against the objection leveled. The officers could not have had appellant under arrest until after they heard this statement because they did not know who they wanted to arrest.

After appellant hung up the telephone receiver, he answered certain questions propounded to him by the officers and volunteered certain information as to his reason for killing his wife and the identity of the weapon used.

Having seen fit to link the two statements together, one of which was clearly admissible, and having leveled only one objection to the two, we must hold, in line with many decisions of this court, that the bill shows no reversible error.

Remaining convinced that this cause was properly decided in our original opinion, appellant's motion for rehearing is overruled.